Angel MARTEL, Plaintiff–Appellant,

v.

COUNTY OF LOS ANGELES; Elias Cuevas; Harry Delong; Richard Mariadiaga; Mark Shaughnessy, et al., Defendants–Appellees.

No. 91–56268.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1993.

Decided April 12, 1994.

Order Granting Rehearing En
Banc Nov. 14, 1994.

Argued and Submitted Jan. 19, 1995.

Decided June 1, 1995.

Thomas E. Beck, Los Angeles, CA, for plaintiff-appellant.

Douglas J. Collodel, Morris, Polich & Purdy, and Robert S. Wolfe, Manning, Marder & Wolfe, Los Angeles, CA, for defendants-appellees.

Before: WALLACE, C.J., FLETCHER, POOLE, D.W. NELSON, CANBY, REINHARDT, BEEZER, WIGGINS, BRUNETTI, RYMER, and KLEINFELD, Circuit Judges.

Opinion by Judge BEEZER; Concurrence by Judge CANBY; Dissents by Judge KLEINFELD, Judge REINHARDT, and Judge FLETCHER

BEEZER, Circuit Judge:

We consider whether a district court's denial of a motion for continuance for purposes of conducting discovery is reversible absent an affirmative demonstration of actual and substantial prejudice to the moving party. Angel Martel appealed the pretrial denial of a continuance following an unfavorable jury verdict in his civil rights action against the County of Los Angeles and eight individual law enforcement officers. We have jurisdiction. 28 U.S.C. § 1291 (1988 & Supp. V 1993). Initially, a divided panel reversed the district court, holding that Martel was entitled to a new trial. *See Martel v. County of Los Angeles*, 34 F.3d 731 (9th Cir.1994). A majority of the active, nonrecused judges of this court voted to rehear the case en banc. *Martel v. County of Los Angeles*, No. 91-56268, slip op. 14025 [34 F.3d 731, 742] (9th Cir. Nov. 14, 1994); Fed.R.App.P. 35(a); 9th Cir.R. 35-3.

Because we conclude that Martel failed to establish the necessary actual and substantial prejudice from the denial of his motion for a continuance to conduct additional discovery, we affirm the district court.

I

On June 6, 1990, deputies from the Los Angeles County Sheriff's Office arrived at the residence of Angel Martel. They were responding to an emergency telephone call from his wife, Ester Martel. When the deputies arrived, Angel Martel, a paranoid schizophrenic, was in the backyard holding a firearm. The deputies subdued Martel through the use of force. Martel suffered serious injuries during the struggle.[1]

Martel filed a civil rights action on April 22, 1991 against the County of Los Angeles and an unspecified number of sheriff's deputies (collectively "County"). *See* 42 U.S.C. §§ 1983, 1985 (1988 & Supp. V 1993). The complaint was based on various claims of police brutality and the use of excessive force. Initially, the complaint named only the County, the Sheriff, and one deputy.

On May 6, 1991, Martel served interrogatories on the County, which requested, among other things, the names of the deputies who participated in the incident at the Martel residence. The County responded on May 24, 1991, naming seven deputies who were at the scene.

---

1. Our recitation of the facts is limited because of the sparse record on appeal. Because we are not in possession of any record from the trial, we obtained a brief set of facts from Martel's complaint and documents in the Clerk's Record. The "Defendant's Trial Brief" in the Clerk's Record does indicate that most of the events that occurred at the Martel residence were not disputed, but rather it was the necessity and propriety of the force used that was the primary issue at trial. Nevertheless, we do not know what transpired, or what evidence was produced, at trial. As we note later, the lack of a proper record is a problem throughout this entire appeal.

The district court entered an order on May 31, 1991, setting the date of a mandatory status conference for June 24, 1991. At the status conference, the court set the trial date for August 27, 1991, with a pretrial conference to begin one day earlier. Although Martel made several efforts to extend the discovery cut-off date, he did not move during June or July for a continuance of the trial date. Martel did file a first and second amended complaint, which reflected the names of additional sheriff's deputies.[2]

On August 22, 1991, four days before the pretrial conference was set to begin, Martel filed an ex parte application to continue the trial date. The district court denied Martel's motion, and the trial proceeded on schedule. Following a three-day trial, the jury returned a verdict in favor of the eight sheriff's deputies. The district court then dismissed Martel's claims against the County and the Sheriff, who were the only remaining defendants.

Martel appeals. He does not argue that any error was committed during the trial. Rather, he argues that the trial court's denial of his motion to continue the trial in order to conduct additional discovery was an abuse of discretion. Martel contends that he was prevented from deposing critical witnesses and otherwise adequately preparing for trial. Martel requests a new trial on his civil rights claims.

## II

As we have observed, a district court's decision to deny a continuance sought for the purposes of obtaining discovery will be disturbed only "upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Sablan v. Department of Fin.*, 856 F.2d 1317, 1321 (9th Cir.1988); *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir.1986); *Data Disc, Inc.*

*v. Systems Technology Assocs., Inc.*, 557 F.2d 1280, 1285 n. 1 (9th Cir.1977). We limit our opinion to the question of actual and substantial prejudice. We need not, and do not, address whether the district court abused its discretion in denying Martel a continuance to conduct discovery.[3] Even if the district court had abused its discretion, such an error is not reversible absent the clearest showing of actual and substantial prejudice.

We have recognized on many occasions the importance of a showing of actual and substantial prejudice in the context of denials of continuances. *Sablan*, 856 F.2d at 1321; *Butcher's Union*, 788 F.2d at 540; *United States v. 2.61 Acres of Land*, 791 F.2d 666, 671 (9th Cir.1985); *United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir.), *amended*, 764 F.2d 675 (9th Cir.1985); *United States v. Mitchell*, 744 F.2d 701, 704–05 (9th Cir.1984); *United States v. Maybusher*, 735 F.2d 366, 369 (9th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). As these decisions indicate, a showing of prejudice is necessary to obtain reversals of decisions on continuance motions in both civil and criminal contexts. Prejudice is measured in terms of the outcome of the trial; in other words, is there a reasonable probability that the outcome would have been different had the continuance been allowed.

We reaffirm these holdings today. The law of this circuit is that "actual and substantial prejudice to the complaining litigant" is required to disturb a district court's decision to deny or grant a continuance to conduct discovery. *Sablan*, 856 F.2d at 1321. The complaining party bears the burden to make the "clearest showing" of actual and substantial prejudice. *Id.*

Having established the standard we will employ to review the district court's

---

**2.** In his initial complaint, Martel named only one deputy, Cuevas. In the first amended complaint, filed July 23, 1991, Martel named six more deputies, DeLong, Mariadiaga, Shaughnessy, Howland, Lammers and Yanes. In the second amended complaint, filed August 12, 1991, Martel named one final deputy, Robles.

**3.** The determination whether a denial of a continuance constitutes an abuse of discretion depends on a consideration of the facts of each case. *United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir.), *amended*, 764 F.2d 675 (9th Cir.1985). We leave for another day, and another set of facts, the question whether the denial of a continuance in a similar context would constitute an abuse of discretion.

denial of a continuance to conduct discovery, we now apply that standard to the facts before us. Martel argues that he was unable to depose the sheriff's deputies who subdued him. He contends that the lack of discovery was detrimental to the preparation of his case. Indeed, Martel argues that the lack of opportunity to "complete *essential discovery*" caused prejudice. We disagree.

Martel's failure to demonstrate actual and substantial prejudice is total. He provided no transcript, not even an abbreviated one, of the events that transpired at trial. Absent the complete record, or at least the relevant portions, it is difficult to even begin to gauge what prejudice arose from the trial court's denial of a continuance. We can only guess at the issues in dispute at trial, the direct testimony of the sheriff's deputies and the extent of cross-examination of the deputies. Perhaps more discovery would have revealed lines of attack on the deputies' credibility or inconsistencies in their recollection, but we are speculating idly. To quote Judge Norris' dissenting opinion to the panel decision:

> [Martel] cannot carry that burden [of showing actual and substantial prejudice] without telling us at least something about what happened at trial. Unfortunately for him, he chooses to tell us nothing about the trial evidence, nor the specific issues of fact in dispute, nor has he given any reason to believe that additional discovery might have changed the outcome of the trial. By failing to tell us anything about the trial, or to provide us with a trial transcript or even portions thereof, Martel fails to carry his burden of showing even a reasonable possibility that additional discovery would have changed the result of the trial. We know nothing about the kind of case Martel actually put on at trial because he has told us nothing.

*Martel,* 34 F.3d at 740.

Even assuming Martel had submitted a full or partial transcript, he still does not tell us what facts he would have gained from the deputies that would have advanced his cause at trial. Although we recognize the potential importance of deposing the deputies, Martel does not elaborate on how additional discovery would support whatever arguments he advanced at trial. We are unwilling to engage in ruminative speculation on this subject. Indeed, our precedents will not permit it. *Sablan* requires "actual and substantial" prejudice. Martel fails to meet this standard.

Our decision in *United States v. Lane,* 765 F.2d 1376 (9th Cir.1985) is in accord with this application. In *Lane,* we held that an appellant failed to show actual prejudice when he did not specify which witnesses he would have interviewed, which documents he wanted to examine or which defenses he would have explored. We did *not* say, however, that merely designating a witness, document, or defense that a party proposes to investigate through discovery demonstrates prejudice. *Lane* provides an example of what is an insufficient showing, but does not establish what constitutes a sufficient showing.

More closely on point is our decision in *Butcher's Union,* 788 F.2d at 540–41. In that case, the complaining party speculated that discovery would enable it to demonstrate sufficient business contacts to establish personal jurisdiction over a defendant. *Id.* at 540. We determined that this speculation was not sufficient to make the "clearest showing" of actual and substantial prejudice. *Id.* Here, Martel failed to meet even this insufficient level of speculation. Martel did not speculate as to what he would have discovered, nor did he explain how that discovery would have altered the result at trial.

Martel's argument that the "adverse verdict alone is proof" that the denial of a continuance was "indisputably prejudicial" demonstrates a fundamental misperception of the law. If the fact that a party lost at trial was indisputable proof that adverse pretrial rulings were prejudicial, we would be reversing jury verdicts at an uncomfortably high rate. Indeed, as Judge Norris aptly noted in his dissent to the original panel's opinion, Martel's argument is "preposterous" because, if it were true, "every trial court error would *per se* be prejudicial to the losing party." *Martel,* 34 F.3d at 741.

We also reject the argument that because the discovery denied to Martel was arguably meaningful, the denial was either inherently

prejudicial, or that a lesser quantum of prejudice need be demonstrated. As Judge Norris correctly observed, "[i]t is not unduly burdensome to require a party seeking reversal for a denial of discovery to tell us at least something about the disputed issues of fact and the trial evidence relevant thereto to help us make a judgment on the likelihood that additional discovery would have affected the outcome of the trial." *Martel,* 34 F.3d at 741. That requirement is no less important merely because a witness is deemed significant to a party's case at trial. Of course, if the complaining party is denied significant discovery or is unduly restricted in discovery matters by the district court or the opposing party,[4] actual and substantial prejudice from the denial of a motion for a continuance might be easier to demonstrate, but that does not relieve the complaining party from the obligation of demonstrating it.

This case does not present us with the opportunity to detail exactly what level of prejudice qualifies as "actual and substantial." We need go no further than to hold that Martel failed to meet the required showing of actual and substantial prejudice because he made no effort to indicate what, if any, facts would have been gained from additional discovery and why, if at all, these facts would have affected the result of the trial.

To conclude, we hold that Martel has failed to establish actual and substantial prejudice to his cause which occurred on account of the district court's denial of his motion for a continuance to conduct discovery. Martel's failure to tell us with any clarity what facts he would have discovered, specifically from deposing the sheriff's deputies, and his failure to provide us with the record of what transpired at trial fall short of the level needed to convince us that the result at trial might have been different had the continuance been granted. We will not disturb the district court's decision.[5]

4. If the complaining party believes that the opposing party is being intransigent on discovery issues, the complaining party has the option of moving pursuant to Fed.R.Civ.P. 37 to compel discovery or to obtain sanctions.

## III

The original panel opinion in this case addressed an issue not raised by either party, specifically, whether the district court violated provisions of the Local Rules of the Central District of California. We decline to address this issue, as it was not raised either before the district court or in the parties' briefs before this court. *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 901 (9th Cir.1994) (we will not address issues on appeal that are not properly raised before the district court); *Abela v. Gustafson,* 888 F.2d 1258, 1266–67 (9th Cir.1989) (same).

Part II.B. of the panel opinion, 34 F.3d at 736–37, is withdrawn and does not constitute the law of this circuit.

## IV

In its brief, the County requested attorney's fees and sanctions on the ground that Martel's appeal was frivolous. *See* Fed. R.App.P. 38. The County also requested attorney's fees as a prevailing party. *See* 42 U.S.C. § 1988. At oral argument before the en banc court, the County waived its requests for fees and sanctions. We accept that waiver.

AFFIRMED.

CANBY, Circuit Judge, joined by D.W. NELSON, Circuit Judge, concurring in the judgment:

I concur in the result reached by the majority, but like Judge Kleinfeld, I take issue with the majority's formulation of the requisite showing of "actual and substantial prejudice."

Judge Kleinfeld is quite correct in stating that Martel cannot be expected to show what facts he would have discovered if he had been given time to depose the defendant deputies. As its name implies, "discovery" is the process of learning that which is previously un-

5. Because we reject Martel's argument, we need not address the County's contention that Martel violated Fed.R.App.P. 10(b)(2), which requires an appellant to include in the record a transcript of all evidence relevant to any finding or conclusion that he or she believes is unsupported by the evidence.

known. It is therefore unrealistic for the majority opinion to require Martel to show "what, if any, facts would have been gained from additional discovery." I also share Judge Kleinfeld's concerns with the "rocket docket."

On the other hand, I agree with Judge Beezer that we cannot assess the denial of an opportunity for discovery in a total vacuum. We must pay *some* attention to the possible effect on the outcome of the trial. *See Martel v. County of Los Angeles*, 34 F.3d 731, 739 (9th Cir.1994) (Norris, J., dissenting). Thus, I would require Martel to show that the denial of an opportunity to depose the defendant deputies might reasonably have had an effect on the outcome of his trial. When the denial of discovery is potentially as central as the denial of an opportunity to depose the defendant deputies in this case, that burden should not be difficult to bear.

Martel, however, has given us nothing. We have no way of knowing the content of the deputies' testimony, or whether that testimony loomed large in the trial. We do not know whether Martel's own witnesses destroyed his case. Basking in total ignorance of events at the trial, I am unable to say that the denial of a continuance caused Martel actual and substantial prejudice. I therefore concur in the result reached by the majority.

KLEINFELD, Circuit Judge, dissenting, with whom Judges FLETCHER and REINHARDT concur:

I respectfully dissent.

Federal Rule of Civil Procedure 1 specifically states that the rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. Sometimes serving one purpose tends to disserve another. For example, it is typical of bicycle engineering that one tries to build a lightweight, inexpensive, sturdy frame. But the better one serves any two goals, the worse one serves the third. Because the Federal Rules of Civil Procedure build pretrial practice around discovery, one cannot go too far toward one of the three desiderata, "just, speedy, and inexpensive," without sacrificing one or two of the others. By requiring a

showing of prejudice which is, as a practical matter, impossible, we unreasonably disable ourselves from reviewing whether denial of a continuance is an abuse of discretion.

## I. FACTS

The declarations of counsel in district court and the pretrial materials set out facts, though there is some contradiction. They appear to be as follows. Angel Martel is a paranoid schizophrenic. On June 6, 1990, the day of his violent confrontation with the police, he may have been suicidal, or he may have had a delusion that people were tampering with his car in order to kill him. For whatever reason, he went into his yard with a loaded shotgun. His wife persuaded their relative, Mr. Ortega, to go into the yard and try to take the gun away from him. The gun went off, fortunately harmlessly, as Mr. Ortega tried to get it away from Mr. Martel. When Mrs. Martel heard the blast, she called the police. Eight sheriff's deputies responded to the call. Mr. Ortega may or may not have separated Mr. Martel from the shotgun by the time the deputies arrived. They unsuccessfully tried to get Mr. Martel down with a Taser, then piled on top of him to get him under control. In the course of this, they broke one of his legs and the kneecap on the other. He also required two sets of stitches to his head. His medical expenses ran close to $50,000.

Martel's attorney, Thomas Beck, filed this § 1983 action against the County of Los Angeles, Sheriff Sherman Block, one named deputy, and all the other deputies under the aliases of Does 1–50. The gist of the complaint is that the deputies used an unconstitutionally excessive amount of force in the course of the arrest. There are other claims as well.

Mr. Beck did not know whom to sue. By chance, he had the name and badge number of the one deputy he named. He believed, no doubt based on the Martels' perceptions and recollections, that about fifteen deputies were involved, so he sent interrogatories with his complaint asking for the names and addresses of all the deputies involved. The County answered the complaint on May 17,

and identified seven deputies in timely answers dated May 24 and received by plaintiff's counsel May 29. Another deputy's identity was provided to plaintiff's counsel August 2. Plaintiff's counsel sent interrogatories and requests for production for the sheriff's department Internal Investigation Bureau file on the incident and other material July 3. Various discovery disputes arose regarding how much of the Internal Investigation Bureau report and personnel files were properly discoverable. Counsel for both sides stipulated to a resolution of the most important dispute on August 2. The defendants agreed to provide the tape recordings of witness statements, transcripts of witness statements, and the Internal Investigation Bureau Report. After going through the material, plaintiff's counsel advised defense counsel by letter that the table of contents, taser report, disposition sheet, unit commander's recommendation, and pages 3, 4 and 32 were missing, and pages 3, 5, 9, 10 and 11 were illegible. It is not clear whether he ever got these materials.

The backdrop for all of this typical discovery skirmishing was the district court judge's standing order regarding the timing of cases. The district judge's order was sent out as soon as the complaint was filed and said trial would be held in three months:

**EXCEPT FOR UNUSUALLY COMPLEX CASES, COUNSEL SHOULD EXPECT THE CASE TO GO TO TRIAL WITHIN THREE MONTHS OF THE FILING OF THE FIRST ANSWER.**

Plaintiff's counsel saw early on that this would be a problem. Part of the problem was that paper discovery—interrogatories and requests for production—needed more time. Also, plaintiff's counsel's time was very fully committed to other trials during the summer of 1991. On July 12, 1991, he moved for an extension of time for discovery, and for shortened time on his motion to amend to add the additional deputies as defendants. The court heard the motion July 22, granted the motion to amend, and set a hearing for August 2 on the motion to compel discovery.[1]

On the eve of trial, both sides were unprepared to try the case. Plaintiff's counsel moved on August 22 for a continuance until October or November, and on August 26 filed a motion to compel discovery. He filed a declaration that he had not deposed any of the deputies yet, because some had just recently been identified, and he had been in trial in other cases from May 21 to June 25, from July 8 to 26, and from August 13 to 16.

Defense counsel was not ready either. She moved for bifurcation, which implied continuance, of trial of the damages part of the case, and of the claims against the County and the Sheriff. She said she had just learned from plaintiff's counsel that medical expenses were over $48,000. Evidently she was surprised to discover how large the special damages for medical expenses would be, and was not prepared to try the damages part of the case because she had not yet done the necessary discovery. She declared that she had not yet deposed plaintiff's doctors or retained medical expert witnesses for the defense.

The defense motion was granted, but plaintiff's motion for continuance was not. The case went to trial on liability alone (not damages) against the deputies who participated in the arrest. The clerk's list of exhibits and witnesses shows that Mr. Martel's attorney called Mr. and Mrs. Martel, Mr. Ortega, and the eight sheriff's department officers whose names he had finally obtained. He played a tape of an interview with the deputy whom he named in the first iteration of the complaint. Mr. Martel's attorney had not had an opportunity to depose any of the deputies, for reasons set out more fully below.

Mr. Beck served the first set of interrogatories May 6, the day the County of Los Angeles was served, asking for the names of the unknown deputies. The County responded with some but not all the names May 24. Mr. Beck asked Ms. Shen, the County's lawyer, to stipulate to an amendment of the complaint substituting the names for his John Doe designations, but she refused. Mr. Beck was in trial in another case until June 25. He moved to shorten time and for leave

---

1. This is the motion resolved by stipulation, as described above.

to amend July 12, and the court granted these motions July 22. Mr. Beck pressed for more information, and got the last name August 2.

Until the court granted leave to amend on July 22, which allowed the new defendants to be joined and served, Mr. Beck could not under Federal Rule of Civil Procedure 33 serve paper discovery on them. He accomplished service of process and paper discovery on them July 30. The last deputy was added by a second amended complaint August 12.

The newly served deputies had 45 days to respond to paper discovery, under the version of Rule 33(a) then in effect. This 45 day period meant that the paper discovery from the deputies, except for the one whose name Mr. Beck knew when he filed suit in April, did not become due until *after* the August 27 trial. The critical paper production from the County, the Internal Investigation Bureau report, was not made until August 2, and it left Mr. Beck short the illegible and omitted pages. That production was made pursuant to the County's stipulation in response to Mr. Beck's motion to compel.

The practical result of this timetable was that Martel's lawyer was required to question the deputies under oath for the first time at trial, in front of the jury. Mr. Beck's busy trial schedule during the summer, the delay between when suit was filed and when Mr. Beck found out what deputies had been involved in the arrest, Mr. Beck's strategy of seeking the paper discovery before deposing the deputies, and the extraordinarily short interval between filing of suit and trial, all worked together to prevent depositions.

The jury decided that none of the deputies had violated Mr. Martel's rights by using unreasonable or excessive force. There is no way to tell what would have happened, had the deputies been required to give their account under oath twice, once prior to trial in depositions. In depositions, unlike in examinations at trial, lawyers can afford the risk of asking questions to which they do not know the answers.

## II.  ANALYSIS

Plaintiff appeals on the sole ground that the district court abused its discretion by denying the plaintiff's motion for a continuance. The majority declines to reach the question of whether the court abused its discretion, for the reason that appellant has not demonstrated "actual and substantial prejudice" from the denial of the continuance. I respectfully disagree with the majority's interpretation of what "prejudice" means in this context. The majority thinks it means a showing that the outcome of the case would have been different, had the continuance been granted. I think it means that a party was precluded by the shortness of time from collecting material evidence or locating material witnesses.

### A.  The Local Rules

Plaintiff's counsel had a right to expect more than three months from answer to trial, when he accepted the Martel case. In the Central District of California in 1991 and 1992, the median time from filing of the answer to trial in civil cases was thirteen months. *See* Administrative Office of The United States Courts, *1992 Federal Court Management Statistics* 129 (1992).

Under the Local Rules, plaintiff's counsel could count on a minimum of five months. Rule 6.1 states that "[w]ithin twenty (20) days after service of the answer by the first answering defendant, and thereafter as each defendant answers, counsel for the parties shall meet in person ..." C.D. Cal. Local Rule (Civil) 6.1. Within fourteen days after holding this meeting, "those attending are mutually obligated to file a Joint Report of Early Meeting...." C.D. Cal. Local Rule (Civil) 6.2. Rule 9.2 builds in a minimum of four months between the "Joint Report" of counsel and the pretrial conference:

> *Pre-trial calendar.* The Court may cause the notice for a Pre–Trial Conference to be sent to the parties on a date *no earlier* than sixty (60) days after the Joint Report of Early Meeting required by Local Rule 6 is due to be filed with the Court. The Pretrial Conference shall be set for a date *no earlier* than sixty (60) days after the mailing of such notice.

C.D. Cal. Local Rule (Civil) 9.2 (emphasis added).

The majority does not consider the effect of the local rules, because they were first raised in our prior opinion in this case, at 34 F.3d 731, not by the parties. The issue, though, is not whether the denial of the continuance should be reversed because the pretrial order violated the local rules. The issue in this case should be whether the district court abused its discretion, and has narrowed down to whether the appellant has demonstrated substantial and actual prejudice. The framework in which discretion was exercised was provided by the Federal Rules of Civil Procedure and the Local Rules of the Central District of California. We cannot ignore the Local Rules. The Local Rules, adopted pursuant to Federal Rule of Civil Procedure 83, are laws of the United States. *United States v. Hvass,* 355 U.S. 570, 575, 78 S.Ct. 501, 504–05, 2 L.Ed.2d 496 (1958). We are required to use our full knowledge of the law, whether the parties cite it or not. *Elder v. Holloway,* —— U.S. ——, ——, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994). The minimum time period of five months provided by the rules, and the median time of thirteen months from answer to trial, provide useful measures of minimum and ordinary times for discovery and trial preparation.

*B. Prejudice*

I disagree with the meaning attributed by the majority to the term "prejudice" in the context of review of denial of a continuance. If we apply the meaning of "prejudice" in our precedents to the facts demonstrated by the record, as we should, prejudice is demonstrated in this case.

The majority concludes that Martel has to show "what facts he would have gained from the deputies that would have advanced his cause at trial." Majority at page 996. Beyond advancing his cause, Martel would also have had to show, to gain reversal under the majority opinion, "what, if any, facts would have been gained from additional discovery and why, if at all, these facts would have affected the result of the trial." Majority op. at page 997.

That is asking too much. It is too much to allow for any real review on appeal, and it is too much to reconcile with our previous decisions. Of course plaintiff cannot show what he would have gained from the discovery and how it would have affected the result at trial. He never got a chance to do the discovery, so he cannot know.

Plaintiff's lawyer represented an insane man who had been hurt in a violent confrontation with the police. Presumably Mr. Martel, his wife, and his brother-in-law thought the police had been more violent than necessary, and told their lawyer what they recalled of what they had perceived. If plaintiff's counsel called all the deputies to the witness stand and asked them if they had used more force than necessary, it was unlikely that their recollections of their perceptions of the incident would be the same as those of Mr. and Mrs. Martel and Mr. Ortega. One practical strategy was to get any reports showing what the deputies had said about the incident before, and then depose one or several of the deputies, or perhaps all of them. If all their deposition testimony appeared to be substantially consistent with other evidence and with each others' testimony, and to support the defense, then plaintiff's counsel might have sought a low settlement or dismissal of the lawsuit. But if one of the deputies, in deposition, told a different story from what he or she had said in the Internal Investigation Bureau report, or from another deputy, or said that another deputy had gone too far, then plaintiff's counsel might develop this into his liability case at trial. Without the continuance, there were no depositions, and evidently, as the jury saw it, there was no case.

Our precedents do not support the construction the majority has imposed on the term "prejudice" in this context. If we adhere to precedent, as I think we should, prejudice in the context of denial of a continuance means an inability to collect material evidence or locate material witnesses. It does not mean facts which would have been obtained and would have affected the outcome.

In *United States v. Maybusher,* 735 F.2d 366 (9th Cir.1984), *cert denied,* 469 U.S. 1110,

105 S.Ct. 790, 83 L.Ed.2d 783 (1985), we affirmed a denial of a continuance. We held that prejudice was not demonstrated, because appellant "refers neither to an inability to collect evidence nor to difficulty in locating witnesses." *Id.* at 370. In the case at bar, by contrast, appellant claimed exactly these kinds of prejudice. In his declaration, Mr. Martel's attorney, Mr. Beck, told the court that because of discovery difficulties, and trouble identifying all of the deputies involved, he had been unable to gather sufficient evidence to go to trial. Under the *Maybusher* standard, such a showing should have sufficed to demonstrate prejudice.

Likewise, when we upheld a denial of a continuance in *United States v. Mitchell,* 744 F.2d 701 (9th Cir.1984), because no prejudice was shown, we did not construe "prejudice" to mean that more time would have changed the outcome. We affirmed because the appellant did not specify "what defense theories his counsel might have explored, what aspects of the case she was unable to investigate, or what witnesses might have been interviewed." *Id.* at 705. *United States v. Lane,* 765 F.2d 1376, 1379 (9th Cir.1985), says substantially the same thing in the same circumstances as *Mitchell.* Neither construes "substantial and actual prejudice" to mean a demonstrated effect on the outcome, as the majority requires today.

In *United States v. Flynt,* 756 F.2d 1352, 1358 (9th Cir.1985), *amended,* 764 F.2d 675 (9th Cir.1985), we reversed a criminal contempt case because the district court denied a thirty day continuance. Flynt had behaved inappropriately in court, and was ordered to show cause why he should not be held in contempt. He had acted like a crazy man, and his attorneys sought a thirty day continuance to obtain a psychiatric evaluation of his mental capacity. We could not have reversed under the standard the majority now imposes, because Flynt's lawyers never produced evidence that the psychiatric report would have been favorable to the defense. We did reverse, however, because the psychiatric testimony would have been "potentially" helpful to the defense, and the "importance of expert witnesses to Flynt's defense is obvious." *Id.* at 1361.

We also reversed for abuse of discretion in denying a continuance in *United States v. 2.61 Acres,* 791 F.2d 666 (9th Cir.1985). Seven years after this condemnation case was filed, and as it was about to go to trial, the government moved to bar the property owner from introducing evidence on the ground that its corporate standing had lapsed for nonpayment of taxes fourteen years before. The corporation unsuccessfully sought a short continuance so that it could pay the back taxes and revive its corporate standing. We held that the requirement of prejudice was satisfied because the denial "precluded Wawona from presenting any evidence concerning the value of the property." *Id.* at 671. This standard is not the same as a requirement that the evidence to be submitted would have changed the outcome.

*Butcher's Union v. SDC Investment, Inc.,* 788 F.2d 535 (9th Cir.1986), has strong language regarding the prejudice which must be shown to obtain a reversal because of denial of discovery. But it is not a continuance case. The plaintiffs sought discovery and the judge denied their motion a year and a half before dismissal. The issue was materiality, not time. The Unions sought to sue various defendants in a RICO case on the theory that the ends of justice required nationwide jurisdiction, but the court decided that separate, local conspiracies were alleged, so only the California defendant was subject to jurisdiction in the case. On appeal, the Unions claimed that their discovery would have developed proof of sufficient local contacts to support California jurisdiction. But the presence or absence of local contacts had not been material to the district court's decision. The lack of prejudice resulted from this immateriality, not from insufficient proof that the discovery would have changed the outcome. No motion for continuance was at issue in the appeal. Likewise, no motion for continuance was at issue in *Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280 (9th Cir.1977). The issue was whether discovery regarding a jurisdiction issue should have been allowed, not whether more time should have been allowed before trial.

*Sablan v. Department of Finance,* 856 F.2d 1317 (9th Cir.1988) affirmed a denial of a continuance. The dispute was about attorneys' fees. The government wanted a continuance to do more discovery regarding the amount, but all that was at issue on appeal was appellee's entitlement to fees as prevailing party. We held that there was no prejudice because the government sought no information "calculated to provide facts germane to the 'prevailing party' issue." *Id.* at 1321–22. Our test of "prejudice" was thus whether the discovery was calculated to provide information "germane" to the issue, not whether it would have caused the case the reach a different result. The majority does not suggest that the discovery sought by Mr. Martel's lawyer was not "germane."

The case at bar falls exactly into the class of cases like *Flynt* and *2.61 Acres,* where we have held that the prejudice requirement was satisfied, and outside the class of cases like *Lane* and *Butcher's Union,* where we have held that it was not. Like those cases in the first class, and unlike those in the second, appellant has specified what he wanted to do with more time—get more documents from the Internal Investigation Bureau investigation files and personnel files, and depose the deputies who participated in the arrest. And as the *Sablan* panel put it, the information sought was reasonably calculated to produce facts germane to the issue before the district court. *Sablan,* 856 F.2d at 1321–22.

According to the standard for prejudice universally applied by our prior precedents, appellant did demonstrate "substantial and actual prejudice." Mr. Beck specifically declared what evidence he wanted and why he had been precluded from getting it. That satisfies *Sablan.* Additionally, the deposition testimony from the deputies was clearly germane to the issue of liability. That satisfies the prejudice requirement of *Flynt.* Could Mr. Martel and his lawyer prove that the outcome would have changed if they had been granted extra time to do the discovery? No, not without knowing the outcome of the depositions before they occurred. But that is not the standard we have applied in the past, and I respectfully suggest that we err in doing so today. We do not need an expen-

sive transcript to apply the test of prejudice established by our precedents: whether the denial of the continuance resulted in an inability to collect material evidence or locate material witnesses. That test is satisfied.

## C. Speed and Justice

As the above explication of our precedents demonstrates, appellant in this case has indeed demonstrated "actual and substantial prejudice," as the term has traditionally been construed in continuance cases. The majority opinion puts a new gloss on the term, requiring more than we have required before. It disposes of the appeal entirely on the basis of failure to show prejudice, so diligence, usefulness, and inconvenience, the other three *Flynt* factors, are not reached or considered. Of course, we can change our course in an en banc decision, so it is not enough for me to say that we are changing course. I must say why we should not. While I fully agree with the traditionally restrictive and deferential review we give to denials of continuances, I nevertheless think that the "rocket docket," allowing three months from answer to trial, gives up too much justice for the speed it gains.

Ever since Roscoe Pound said "justice delayed is justice denied" some people have inferred that faster is always better. But too much speed as well as too much delay can deny justice. Speed of the litigation process should be managed so that the truth, not the speed, determines the outcome. One reason why "the law's delay" is an ancient phrase is that fair resolution of a dispute takes time.

Why should this case have taken more than three months to prepare? The reason is that in civil litigation, the federal rules of civil procedure make discovery the core of trial preparation. Most cases settle after the lawyers find out the facts, and determine that their estimates of value overlap. For those that go to trial, discovery typically establishes the evidentiary basis for the jury's verdict. Under the deadlines established by the federal rules, and the practicalities for making the discovery provided for, three months allows too little time for discovery. There doubtless are individual cases where, in a status and scheduling conference

shortly after commencement, the district judge may exercise reasonable discretion to limit discovery and accelerate trial, but no such individualized discretion was exercised to bar discovery in this case. The issue on appeal in the case at bar was time for discovery, not appropriateness of the discovery.

Mr. Martel's lawyer had a schizophrenic, delusional client who was unlikely to be of great help in preparing the case. There had been no criminal trial, because Mr. Martel was not charged with a crime, so Mr. Beck could not read a transcript to see what the deputies said about the incident. He had diligently pursued the paper discovery—interrogatories and requests for production—but it had not yet been completed, evidently because of a good faith dispute about what was discoverable, and perhaps because of secretarial carelessness in the defense attorney's office or sheriff's office in copying the Internal Investigation Bureau file. The rules generally allow thirty days for responses to paper discovery, and that much time or more is generally necessary for the document searches necessary for compliance. Mr. Beck had a good reason to have delayed his depositions—he was exceedingly busy in other trials throughout the summer. Based on the local rules, he had a right to accept the case and plan his handling of it on the assumption that it would not go to trial before October at the earliest.

The delays in this case were not unusual. Before a lawyer can serve paper discovery or make a motion to amend, he must review the file, think about what discovery would be worth doing, and draft the papers to accomplish it. When a lawyer receives such papers, she must read them, mail them to her client, and advise her client on response duties. The client must then determine how the information can be found and who should look for it, direct an appropriate search, assemble the material, and produce it.

Every detail of every step takes time. Sending papers means a lawyer dictates them, a secretary types them, the lawyer revises them, the secretary returns the final copies, the lawyer signs them and gives the secretary directions for service, the secretary photocopies and mails them, and the post office delivers them. Responding to discovery means responding counsel reads the papers, dictates instructions to her clients, goes through the same process of getting the papers from conception to delivery. The client assigns people to look in file cabinets, put yellow stickies and paper clips on materials in the files, consult the lawyer on the telephone about whether various documents are meant to be included, photocopy designated papers, write explanations and responses, and send them to the lawyer.

This adds up to weeks even when there are no special difficulties. That is probably why the rules allow thirty days for response. Some of this delay could be avoided, if instead of processing papers in the ordinary ways, all the lawyers, clients and secretaries left their desks and did everything together, orally, at the same time. But that would greatly increase the expense. The clients would have to pay the lawyers to stand around with the secretaries as they went through the file cabinets, the secretaries would have to stand around as the lawyers read and tabbed material, and everyone would have to stand around as the files were disassembled and the discoverable pieces photocopied. Much advance preparation by the lawyers and clients would be needed for such important and fast moving discovery. The cheapest way to get the routine paper discovery done is usually the routine, somewhat slow way described.

I can see no good reason for the federal courts to tell lawyers, "if you accept a case, you should depose the witnesses immediately, and be prepared to treat it as a priority so that it can go to trial in three months." This conflicts with the requirement of Federal Rule of Civil Procedure 1, that the rules be construed to secure "inexpensive" resolution of disputes. Most lawyers are already quite busy, as Mr. Beck was, when they take on a new case. That is good, not bad. It keeps fees down. Lawyers' fees must be higher, or their incomes lower, if they cannot manage the scheduling of cases so that they can keep busy all the time. If federal district court cases must take on the kind of priority the "rocket docket" requires, then lawyers defending them must maintain a staff of under-

employed attorneys to whom they can assign the work. That raises prices on the defense side. On the plaintiffs' contingent fee side, prices are raised by rejecting cases unless liability is highly likely and damages are great. A price increase to plaintiffs typically manifests itself in rejection of cases with strong liability but smaller damages, such as injuries but no death, paralysis or brain damage. That reduces the availability of a remedy for violations of constitutional rights. On both sides, too much speed makes the case more expensive to litigate.

Too much speed also has a corrosive effect on civility. The traditional answer, when a lawyer calls an adversary and says "would you give me an extension, so that I can go to my children's summer camp parents' day?" is "Yes, of course." But a highly compressed schedule requires that the answer be "sorry, I can't." That forces the lawyers into court to claim bad faith discovery demands, bad faith responses, and make other attacks on each other which would often be unnecessary if they had time to work out reasonable and practical discovery exchanges. The less pleasant lawyers' work becomes, the more they will charge to do it.

Increased expense and loss of civility are not the only, or the most important, casualties of too rapid a docket. The most important requirement in Rule 1, and in any system of justice, is that the system be just. A verdict, as the etymology of the word implies, should be true. Justice requires that the outcomes be reasonably reliable. After all, we could get speedy and inexpensive dispute resolution by flipping coins. Justice requires reliable, that is, true, verdicts. Too much speed reduces reliability, so produces less just outcomes. More verdicts are likely to be false if federal civil cases go to trial so quickly that reasonable discovery cannot be completed first.

In most cases, both sides have facts which it would be to their advantage that the other side not find out. For example, in this case, hypothetically, Mr. Martel might have preferred that the defense not find out that he had not been taking his prescribed medication to control his psychosis, and the defense might have preferred that the plaintiff not find out about some differences in perception, recollection and judgment among the deputies. If there is ample time for discovery, then these sorts of things are likely to be found out. But if there is not, the probability of disclosure is reduced. The value of hiding evidence is much greater if the risk of discovery is reduced. If the case proceeds too speedily to trial, the jury is likely not to hear some critical evidence, because it will never have been discovered by the party to whose advantage it would be to bring it out.

This is not to suggest that lawyers would routinely hide evidence they know they should produce. Often it takes considerable time, thought and effort for parties to discover their own evidence, particularly if they are multidepartmental institutions, or if they do not yet fully understand what will turn out to be relevant. In this case, it is significant that neither side could prepare it in three months. The plaintiff needed, but was denied, more time to get the facts on liability, which were largely under defense control. The defense needed, and was given, more time to get the facts on damages, which were under plaintiff's control.

Many lawyers prudently delay depositions until they have received the responses to paper discovery. That way they know what to ask. Depositions are expensive. They can often be more focused, shorter, cheaper and fewer, as well as more productive of truth, if they are preceded by paper discovery. Sometimes the paper discovery facilitates settlement or dismissal without the expense of depositions. Professor Keeton explains why depositions are often best delayed until after paper discovery:

> Another reason often relied upon in delaying the deposition of an adverse party or witness is the desire for completion of all practical investigation before the deposition is taken, so that the lawyer taking it for discovery purposes will be better informed as to matters concerning which it will be wise for him to question the adverse witness or party.

Robert E. Keeton, Trial Tactics and Methods 382 (1954). The "rocket docket" forces lawyers to notice up all possible depositions as soon as they get the case, even though that is

likely greatly to increase expense and reduce the truth-seeking value of the depositions.

### III. CONCLUSION

In this case, appellant demonstrated substantial and actual prejudice as the term has traditionally been understood in the context of review of denials of continuances. We should apply the *Flynt* criteria and reverse, as we did in our earlier panel decision. Federal procedure should provide "just, speedy, and inexpensive" resolution of disputes. The "rocket docket," and our decision in this case, sacrifice two of those desiderata to the third. Cutting the time from answer to trial to three months is not worth the burden it imposes on justice.

REINHARDT, Circuit Judge, Dissenting:

The majority opinion is what it is. Judge Kleinfeld's dissent, in which I fully join, effectively disposes of its reasoning. However, Judge Canby's concurrence, joined by Judge D.W. Nelson, is extremely disappointing. We should, as judges, be able to bring a little practical knowledge, understanding, and wisdom to the decision-making process. To suggest that in a case in which the plaintiff alleges that he was assaulted by a number of sheriff's deputies, the testimony of those deputies could be anything but critical, or the denial of the right to take their depositions could be anything but harmful, is either incredibly naive or wholly elevates form over substance. We are here after all, as I am sure Judges Canby and Nelson would agree, to seek truth and do justice. What more need a plaintiff show other than that it was the alleged perpetrators of the constitutional wrong whose depositions he was precluded from taking? There is a limit to the Frankfurter view of jurisprudence. I think we exceed it here.

Moreover, if it were so critical that we determine from a transcript what we all know anyway, the Rules permit us to order what we need. *See* Federal Rule of Appellate Procedure 10(e). I hardly think it necessary to force a mentally disturbed civil rights plaintiff to pay for a transcript in a case such as this. Certainly, his failure to do so should not cause us to forfeit his appeal and his rights.

FLETCHER, Circuit Judge, Dissenting:

I concur wholeheartedly in Judge Kleinfeld's and Judge Reinhardt's dissents. I simply add an additional perspective to their excellent opinions.

The majority declines to decide whether the trial judge abused his discretion in denying a continuance to allow the completion of discovery. It looks only to prejudice after trial.

I respectfully suggest it is important to a proper analysis and understanding of the district court's role to decide whether the judge abused his discretion.[1] Why do I think it important? Whether the movant is likely to suffer prejudice from the denial of a continuance is an element of the determination that the district judge should make in granting or denying the opportunity for further discovery. The district judge would abuse his discretion if he prejudiced the plaintiff's ability to prepare his case. In this case, the judge broke his own court's rules by shortening the *minimum* time the parties are allowed for preparation. Prejudice should be presumed—the burden to rebut prejudice then, should be on the defendants.

By its own admission, the majority concedes "the necessity and propriety of the force used ... was the primary issue at trial." (Maj. Op. p. 994, fn. 1.) The inability to depose the defendant-perpetrators as to their individual roles in the incident, what they perceived as to the roles of other defendants, why they did what they did when they did it, of course, was prejudicial.

The majority expresses its "unwilling[ness] to engage in ruminative speculation." (Maj. Op. at 996.) May I suggest the majority's narrow focus as to what is prejudice is the vice. It doesn't take a rocket scientist to perceive the prejudice that resulted from the

---

1. I agree with the two dissents and the inference in the concurring opinion of Judge Canby (in which Judge D.W. Nelson concurs) that an abuse occurred.

"rocket docket's" application in this case. It takes no ruminative speculation to see it.

