88 P.3d 375 (2004)
151 Wash.2d 226
STATE ex rel. CITIZENS AGAINST TOLLS (CAT), a Washington non-profit Corporation, Appellant,
v.
Michael J. MURPHY, Washington State Treasurer and Chair of the Washington State Finance Committee; Douglas B. MacDonald, Secretary of Transportation; Washington State Department of Transportation; Aubrey Davis, Chair of the Washington State Transportation Commission; and the Washington State Transportation Commission, Respondents, and
Tacoma Narrows Constructors, a Joint Venture, Intervenor.
No. 73745-2.
Supreme Court of Washington, En Banc.
Argued September 18, 2003.
Decided April 8, 2004.
*378 Shawn Newman, Olympia, Preston Gates & Ellis, Stephen Smith, Seattle, for Appellant.
Christine Gregoire, Attorney General, Thomas Morrill, Deborah Cade, Assistant Attorneys General, for Respondents. *376
*377 MADSEN, J.
This case involves several challenges to construction of a second Tacoma Narrows Bridge. Citizens Against Tolls (CAT) seeks reversal of the trial court's grant of summary judgment in favor of Michael Murphy, Washington State Treasurer and Chair of the Washington State Finance Committee; Douglas MacDonald, Washington State Secretary of Transportation; Washington State Department of Transportation (WSDOT); Aubrey Davis, Chair of the Washington State Transportation Commission; and the Washington State Transportation Commission (WSTC) (collectively, the State). The principal issues are (1) whether the State violated existing state bidding laws when WSDOT executed a design-build agreement and the personal service contracts relating to the Tacoma Narrows Bridge project, (2) whether Engrossed House Bill (EHB) 2723 conflicts with RCW 47.10.846, (3) whether the State violated chapter 47.05 RCW (the priority programming statute), and (4) whether EHB 2723 violates article II, section 19 of the Washington Constitution. We conclude that summary judgment was properly granted and affirm the trial court.

FACTS
In 1993, the legislature enacted the Public-Private Transportation Initiatives act (PPI Act). Ch. 47.46 RCW. Under the PPI Act, the secretary of transportation is authorized to select up to six demonstration project proposals from private entities, so that the private entities can work with WSDOT on public projects. RCW 47.46.030. The construction of the second Tacoma Narrows Bridge was one of the six projects selected under the PPI Act.
In May 1994, three separate firms submitted proposals for the second Tacoma Narrows Bridge after WSDOT sent requests for proposals to interested parties. In August 1994, WSDOT selected a proposal submitted by United Infrastructure Washington (UIW). On June 15, 1999, WSDOT executed a development agreement with UIW (original UIW agreement). Under that agreement, UIW was responsible for developing and financing the project as well as for hiring all necessary contractors, including a design-build contractor.
On July 6, 1999, Peninsula Neighborhood Association (PNA), a nonprofit corporation from Gig Harbor, filed a lawsuit against WSDOT, alleging that the PPI Act is unconstitutional and that WSDOT violated various state laws in developing the Tacoma Narrows Bridge project. On November 9, 2000, this court found that the PPI Act is constitutional but that WSDOT violated former RCW 47.56.270 (1983), former RCW 47.56.271 (1983) and RCW 47.56.240 because the original UIW agreement allowed UIW to toll the existing Tacoma Narrows Bridge and to fix toll rates. State ex rel. Peninsula Neighborhood Ass'n v. Dep't of Transp., 142 Wash.2d 328, 340-46, 12 P.3d 134 (2000). As a result, we found the original UIW agreement unenforceable. Id. at 347, 12 P.3d 134.
In July 2001, the legislature added a new requirement that WSDOT develop a competitive bidding process for soliciting a design-build contract. LAWS OF 2001, ch. 226, § 2; RCW 47.20.780.[1] Then, in March 2002, the legislature passed EHB 2723, titled "AN ACT Relating to modifying the Public-Private Transportation Initiatives Act by authorizing state financing and administration of toll facilities; amending RCW 47.56.010, 47.46.030, 47.46.040, 47.46.050, 47.46.060, *379 47.56.030, 47.56.270, 47.56.271, 39.46.070, and 47.56.245; reenacting and amending RCW 43.84.092; adding new sections to chapter 47.46 RCW; and creating new sections." Laws of 2002, ch. 114; EHB 2723, 57th Leg., Reg. Sess. (Wash.2002). EHB 2723 took effect on June 13, 2002 and was aimed at removing impediments to construction of the second Tacoma Narrows Bridge, such as the prohibition against tolling the existing bridge, which resulted in this court's ruling in Peninsula Neighborhood Ass'n that the original UIW agreement was unenforceable. Final Legislative Report, 57th Leg., Reg. Sess. 112 (Wash.2002).
Under section 13 of EHB 2723, if a proposal is or has been selected, subsequent agreements may be made to implement portions of the proposal that modify the proposal or that do not incorporate all the features of the proposal. Any such modified agreement does not require the solicitation or consideration of additional proposals for all or any portions of the services rendered under that modified agreement. EHB 2723, § 13. Additionally, EHB requires that projects under the PPI Act comply with all applicable rules and statutes in existence at the time the agreement is executed. EHB 2723, § 14.
On July 16, 2002, WSDOT and UIW executed an amended development agreement (amended UIW agreement), modifying the original UIW agreement.[2] Under the amended UIW agreement, WSDOT, rather than UIW, was responsible for hiring a design-build contractor. On the same day, WSDOT executed a design-build agreement (Design-Build Agreement) with Tacoma Narrows Constructors (TNC). Under the Design-Build Agreement, WSDOT was to pay $615 million to TNC. Additionally, it provided for a price increase of approximately $3 million for each month of delay with the first increase due on September 30, 2002.
WSDOT also concluded at least three personal service contracts between March and May 2002 relating to the Tacoma Narrows Bridge project.
On July 23, 2002, the Washington State Finance Committee, consisting of Governor Gary Locke, Lieutenant Governor Brad Owen, and State Treasurer Michael Murphy, met and passed a resolution approving the sale of $285 million in Referendum 49 bonds. RCW 43.33.010. Of that amount, $158 million would be used for the design and construction of the second Tacoma Narrows Bridge. Referendum 49 authorized the sale of bonds to finance transportation projects upon request by WSTC. RCW 47.10.843.
Under RCW 47.10.846, the bonds issued under Referendum 49 are a general obligation of the State. The principal and interest on the bonds shall be first payable from the proceeds of a state excise tax on motor vehicle and special fuels. Additionally, the statute provides that the legislature will continue to impose the taxes on motor vehicle and special fuels in amounts sufficient to pay, when due, the principal and interest on all bonds issued under Referendum 49. RCW 47.10.846.
Pursuant to EHB 2723, toll revenues derived from the bridge project will be used to reimburse the motor vehicle fund in the state treasury. EHB 2723, § 12. EHB 2723 also opened up the possibility of tolling the existing Tacoma Narrows Bridge. EHB 2723, § 21.
The state finance committee was scheduled to meet on September 18, 2002, to conduct the bond sale so that WSDOT could meet the "notice to proceed" requirement by September 30, 2002. Clerk's Papers (CP) at 153, 801. The sale of the bonds was necessary to cover progress payments and mobilization costs.
CAT is a nonprofit organization from Gig Harbor concerned about tolling as a result of the Tacoma Narrows Bridge project. On July 11, 2002, CAT sent a letter to the attorney general requesting legal action, alleging that EHB 2723 violates various state laws and the state constitution. After a couple of exchanges, the attorney general's office declined the request on August 14, 2002.
*380 On August 30, 2002, CAT filed suit against the State in Thurston County Superior Court. CAT claimed that (1) Referendum 49 violates article VIII, section 1(i) of the state constitution because the amount of the debt established by Referendum 49 was not approved by three-fifths of each legislative house;[3] (2) the use of toll revenue to pay off the bonds financing the Tacoma Narrows Bridge project violates RCW 47.10.846; (3) EHB 2723 violates article II, section 19 of the state constitution; (4) the Design-Build Agreement and other personal service contracts related to the Tacoma Narrows Bridge project violate the state bidding laws; and (5) the Tacoma Narrows Bridge project violates the priority programming statute.
On September 3, 2002, the State moved for an order shortening time to hear its motion for summary judgment. However, the actual motion to shorten time was not filed until October 16, 2002. CAT received notice of the hearing on the morning of September 3, several hours before the hearing. The trial court granted the motion to shorten time and the State was ordered to file its motion for summary judgment by September 5, 2002. CAT's response was due on September 11, 2002. The State's reply was due on September 12, 2002. Oral argument on the motion was set on September 13, 2002.
In its motion for summary judgment, the State responded to CAT's claims but also contended that the statute of limitations had run for certain of these claims. CAT filed its response on September 11, 2002. In the meantime, CAT asked several legislators for their interpretation of EHB 2723, obtained a copy of the amended UIW agreement and the Design-Build Agreement, and identified three personal service contracts relating to the Tacoma Narrows Bridge project executed by WSDOT. The State's reply brief was filed on September 12, 2002, but CAT received it only on the morning of September 13, 2003, the date scheduled for oral argument. CAT resisted summary judgment, arguing that it needed additional time to conduct discovery.
In a letter opinion dated September 16, 2002, the trial court granted the State's motion for summary judgment. First, the trial court concluded that the additional evidence sought by CAT would not affect its ruling. Then the court held that Referendum 49 is constitutional, that use of toll revenues to reimburse the motor vehicle fund does not violate RCW 47.10.846, and that the State did not violate state bidding laws because the intent to create an alternative process for contracting of certain projects under the PPI Act was clear. Additionally, the court held that EHB 2723 does not violate article II, section 19 of the Washington Constitution. The final order granting the State's motion was filed on September 27, 2002.
CAT filed its notice of appeal in the Court of Appeals, Division Two, on September 17, 2002. On April 3, 2003, CAT filed a motion to transfer to this court, arguing that the case involves fundamental and urgent issues of broad public import which require prompt and ultimate determination. RCW 2.06.030(d); RAP 4.2(a)(4). The motion was granted on May 12, 2003, and transferred to this court.

ANALYSIS
I. Order Shortening Time
Initially, CAT argues that the trial court erred in granting the State's motion for an order shortening time to hear its motion for summary judgment.
A trial court has discretion when ruling on a motion to shorten time. A deviation from the normal time limits is permitted as long as there is ample notice and time to prepare. Loveless v. Yantis, 82 Wash.2d 754, 759, 513 P.2d 1023 (1973). An appellate court will overturn a discretionary ruling only for a manifest abuse of discretion. In re Dependency of E.S., 92 Wash.App. 762, 769, 964 P.2d 404 (1998); Coggle v. Snow, 56 Wash.App. 499, 504, 784 P.2d 554 (1990). Here, the trial court shortened the time to eight days between the filing and the hearing. See CR 56(c) (specifying 28 days). In order to prevail, CAT must show it was prejudiced by this ruling. Zimny v. Lovric, 59 Wash.App. 737, 740, 801 P.2d 259 (1990).
*381 To establish prejudice, the party making the challenge to an order shortening time must show a lack of actual notice, a lack of time to prepare for the motion, and no opportunity to submit case authority or provide countervailing oral argument. Id. at 740, 801 P.2d 259. CAT claims that the ruling here deprived it of a reasonable opportunity to discover the contracts involved in the Tacoma Narrows Bridge project and whether or not they were competitively bid in accordance with the state bidding laws. CAT also claims that, due to lack of time, it failed to discover whether or not the taxes on motor vehicle and special fuels are sufficient to pay off the Referendum 49 bonds financing the Tacoma Narrows Bridge project. Finally, CAT contends that the trial court should have given it more time to defend against the motion, citing CR 56(f).[4] CAT points out that all it could do before the hearing was to identify the Design-Build Agreement, the amended UIW agreement, and three personal service contracts and to attempt to contact legislators concerning their interpretation of EHB 2723.
In support of its position to reverse, CAT relies on three cases: Cofer v. Pierce County, 8 Wash.App. 258, 505 P.2d 476 (1973); Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); Martel v. County of Los Angeles, 34 F.3d 731 (9th Cir.1994). In Cofer, the Court of Appeals reversed a trial court's ruling denying the plaintiff's request for continuance, pointing out that a failure to accord the nonmoving party a reasonable opportunity to show the existence of an issue of material fact constitutes an abuse of discretion. 8 Wash.App. at 263, 505 P.2d 476. In that case, the plaintiff asked for a continuance because a witness suddenly fell ill one week before the hearing on defendant's motion for summary judgment and was unavailable at the hearing. Id. at 259-60, 505 P.2d 476. In Ungar, the Court set a trial date for the defendant, who was charged with willful and disruptive contempt of the court, only five days after the court served him. Then, the trial judge denied several motions for continuance. 376 U.S. at 581, 84 S.Ct. 841. In Martel, the plaintiff was entitled to a new trial where he was able to identify seven of eight defendants less than three months before the trial date and received response to discovery only after the trial date. 34 F.3d at 733.[5]
Unlike the defendant in Ungar, CAT had more than five days to prepare. Here, EHB 2723 became effective on June 13, 2002. Thus, it had been clear for three months before the September 13, 2002 hearing that the toll revenues would reimburse the motor vehicle fund and that the motor vehicle fund would pay off the Referendum 49 bonds financing the Tacoma Narrows Bridge project. Additionally, on July 11, 2002, CAT sent a letter to the attorney general that pointed out alleged violations of various state laws and the State Constitution, including the issue of failing to comply with the state bidding laws. The Design-Build Agreement and the amended UIW agreement were executed on July 16, 2002, nearly two months before the State's motion was heard.
Moreover, unlike in Cofer, evidence that CAT was seeking had no evidentiary value. The interpretation of a statute by an individual legislator does not show legislative intent. Scott v. Cascade Structures, 100 Wash.2d 537, 544, 673 P.2d 179 (1983). Here, CAT was seeking the legislators' interpretation *382 of EHB 2723. Likewise, whether there would be sufficient funds to pay the Referendum 49 bondsanother fact CAT hoped to adduceis irrelevant because the issue involves a question of lawwhether tolls can be used to repay the motor vehicle fund.
Under the circumstances, we cannot conclude that CAT lacked actual notice and an opportunity to prepare for the motion, to provide countervailing oral argument, and to submit case authority.
Next, CAT asserts that it was prejudiced because the motion for an order shortening time was not filed at the time of the September 3, 2002 hearing. This assertion is unpersuasive. While the motion was filed on October 16, 2002, CAT actually received notice of an emergency hearing on the morning of September 3, 2002, several hours before the hearing.
CAT also argues that it did not have an opportunity to prepare for the hearing on September 13, 2002 because it did not receive the reply brief by the State, due on September 12, 2002, until the morning of the hearing. CAT goes on to point out that the fact that counsel for CAT had another case on the same day aggravated a lack of opportunity to prepare for the motion and that counsel did not have an opportunity to consider the reply brief. However, a reply brief is optional, and the State could argue from a reply brief without filing it, as the trial court pointed out.
CAT also complains that the trial court did not strike the late reply brief. As pointed out above, an appellate court will overturn a discretionary ruling only for a manifest abuse of discretion. In re Dependency of E.S., 92 Wash.App. at 769, 964 P.2d 404; Coggle, 56 Wash.App. at 504, 784 P.2d 554. CAT has failed to meet its burden to show that the trial court abused its discretion in refusing to strike the reply brief.
Finally, CAT claims the motion to shorten time was unnecessary because this case would not have been resolved by September 18, 2002, the day scheduled for the sale of the Referendum 49 bonds financing the Tacoma Narrows Bridge project, even if the trial court had granted the motion for an order shortening time for the hearing. However, even if correct, the point is irrelevant to whether CAT lacked actual notice and opportunity to prepare for the motion for summary judgment.
Accordingly, we conclude that the trial court did not abuse its discretion in granting the State's motion for an order shortening time to hear its motion for summary judgment.[6]
II. CAT's Challenge Was Timely
The State argues that CAT is barred from alleging that the amended UIW agreement and the Design-Build Agreement, executed on July 16, 2002, violated the state bidding laws because CAT failed to timely raise these issues. The State correctly points out that CAT resorts to a constitutional writ of certiorari because those contracts do not represent agency actions. CONST. art. IV, § 6; RCW 34.05.010(3). The State argues, however, that CAT should have raised the issues within 30 days following execution of the agreements, using the time period allowed for an appeal under a statute or court rule by analogy, citing City of Federal Way v. King County, 62 Wash.App. 530, 536, 815 P.2d 790 (1991) and National Homeowners Ass'n v. City of Seattle, 82 Wash.App. 640, 919 P.2d 615 (1996). These cases concern land development, and the courts adopted a 30 day period because of a need for finality in such decisions. CAT agrees with the State that the analogy rule should apply but argues that *383 the appropriate analogy is RCW 47.28.120,[7] which sets forth a 180 day appeal period.
Neither party argues the correct rule. In Clark County Public Utility District v. Wilkinson, 139 Wash.2d 840, 847-48, 991 P.2d 1161 (2000), we held that constitutional writs of certiorari need not be sought within the analogous time period ordinarily allowed by statute or rule for filing an appeal. Instead, we held that laches, an equitable doctrine, governs the determination of a reasonable time for constitutional writs of certiorari. Id. at 848, 991 P.2d 1161. Laches consists of two elements: (1) inexcusable delay and (2) prejudice to the other party from such delay. Id. While a court may look to various factors, including similar statutory and rule limitation periods to determine whether there was an inexcusable delay, the main component of laches is prejudice to the other party. Id. at 848-49, 991 P.2d 1161.
Here, CAT asked the attorney general's office to take action before filing suit. This is a necessary step for a taxpayer lawsuit. CAT filed this suit 16 days after the attorney general's office declined CAT's request. Additionally, CAT brought this suit approximately 45 days after the execution of the amended UIW agreement and the Design-Build Agreement. There was no inexcusable delay here. As for prejudice, the State claims that it is prejudiced by the delay because it would have to pay a penalty to TNC under the Design-Build Agreement if it failed to issue the Referendum 49 bonds on September 18, 2002 and give TNC notice to proceed. The State's argument is mere speculation and insufficient for a finding of prejudice. Accordingly, CAT's claims relating to the amended UIW agreement and the Design-Build Agreement are not barred.
III. State Bidding Laws
CAT argues that the State violated the bidding requirements under the state bidding laws, chapter 39.29 RCW, chapter 47.28 RCW, and RCW 47.20.780, when it executed the amended UIW agreement, the Design-Build Agreement and the personal service contracts identified by CAT because WSDOT did not go through the bidding process specified under those provisions.
Under section 13 of EHB 2723, if a proposal is or has been selected, subsequent agreements may be made to implement portions of the proposal that modify the proposal or that do not incorporate all the features of the proposal.[8] Any modified agreement does not have to go through the process under the state bidding laws.[9]
The meaning of a statute is a question of law reviewed de novo. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9, 43 P.3d 4 (2002); State v. Breazeale, 144 Wash.2d 829, 837, 31 P.3d 1155 (2001); State v. J.M., 144 Wash.2d 472, 480, 28 P.3d 720 (2001). The court's fundamental objective is to ascertain and carry out the legislature's intent, and if the statute's meaning is plain on its face, then the court *384 must give effect to that plain meaning as an expression of legislative intent. Campbell & Gwinn, 146 Wash.2d at 9-10, 43 P.3d 4; J.M., 144 Wash.2d at 480, 28 P.3d 720. Under this plain meaning rule, examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found, is appropriate as part of the determination whether a plain meaning can be ascertained. Campbell & Gwinn, 146 Wash.2d at 10-12, 43 P.3d 4; In re Estate of Lyons, 83 Wash.2d 105, 108, 515 P.2d 1293 (1973). If, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to construction aides, including legislative history. Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4; Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 808, 16 P.3d 583 (2001).
Here, the legislature's intent that subsequent agreements be exempt from the bidding requirements is apparent from the language in sections 1 and 13 of EHB 2723 and RCW 47.46.030. Section 1 emphasizes the legislature's desire to prevent unreasonable delay of critical transportation projects that are essential for public safety and welfare.[10] Section 13 of EHB 2723 provides that "subsequent agreements may be made to implement portions of the proposal that modify the proposal or that do not incorporate all the features of the proposal. Any such modified agreement does not require the solicitation or consideration of additional proposals for all or any portion of the services rendered under that modified agreement."
It is important to note that EHB 2723 does not change the contracting procedure under the PPI Act. Rather, EHB 2723 is the legislature's attempt to remove the impediments to the Tacoma Narrows Bridge project identified in Peninsula Neighborhood Ass'n so that the project could go forward. Final Legislative Report, 57th Leg., Reg. Sess. 112 (Wash.2002). Section 13 of EHB 2723 merely clarifies that any agreement related to Tacoma Narrows Bridge project executed after the original UIW agreement is exempt from additional solicitation requirements as long as the original UIW agreement was lawfully executed. Accordingly, the amended UIW agreement, the Design-Build Agreement and the personal service contracts do not violate state bidding laws as long as the original UIW agreement was lawfully executed. The question is whether the State was required to follow state bidding laws in executing the original UIW agreement under the PPI Act.
The State argues that the PPI Act creates an alternative process to the bidding requirements under the state bidding laws because the selection process under the PPI Act is incompatible with the requirements of the state bidding laws. The State points out that the courts have upheld statutory exceptions to bidding laws created by the legislature citing National Electrical Contractors Ass'n v. Riveland, 138 Wash.2d 9, 978 P.2d 481 (1999); Washington Waste Systems, Inc. v. Clark County, 115 Wash.2d 74, 794 P.2d 508 (1990); and Shaw Disposal, Inc. v. City of Auburn, 15 Wash.App. 65, 546 P.2d 1236 (1976).
In National Electrical Contractors Ass'n, this court upheld the department of corrections' decision to use inmate labor instead of soliciting bids from private contractors based on RCW 72.01.110. That statute permitted the department of corrections, under certain circumstances, to by-pass the competitive bid procedures for the construction and repair of prison facilities. 138 Wash.2d at 28-29, 978 P.2d 481. Similarly, in Washington Waste System, Inc., we found that Clark County did *385 not violate RCW 36.32.250, the statute calling for a competitive bid in executing a solid waste contract, because the legislature created an alternative procedure for certain waste contracts under RCW 36.58.090, including the one at issue. 115 Wash.2d at 76-77, 794 P.2d 508. Again, in Shaw Disposal, the Court of Appeals found that garbage and trash collection is exempt from the statutory bidding requirement because this function is a matter that public agencies are authorized to address using the best means available to protect the public health. 15 Wash.App. at 68, 546 P.2d 1236.
CAT correctly points out that these cases are distinguishable from this case. Indeed, unlike in National Electrical Contractors Ass'n and Washington Waste System, Inc., the PPI Act does not expressly create an exception to the state bidding laws. Unlike Shaw Disposal, this case does not concern garbage and trash collection.
Nevertheless, we are persuaded that the selection process authorized by the PPI Act is simply incompatible with the requirements under the state bidding laws in two senses. First, under the state bidding laws, WSDOT must publish a call for bids for the construction of the highway according to the maps, plans, and specifications. RCW 47.28.050. This assumes that WSDOT already has the maps, plans and specifications. Thus, WSDOT must have a design before calling for bids. On the other hand, the PPI Act contemplates that WSDOT will solicit proposals from the private entities that will undertake the planning and design of the project. Thus, under the PPI Act, WSDOT cannot have a design before the solicitation.
Second, while RCW 47.46.030 explicitly requires negotiation of an agreement after the selection of proposals, negotiation with a bidder and alteration of its bid after bid opening is not permitted under the state bidding laws. J.J. Welcome & Sons Constr. Co. v. State, 6 Wash.App. 985, 990, 497 P.2d 953 (1972) (Court of Appeals pointed out that state bidding law prohibited any postopening revision of a bid on a highway contract); Platt Elec. Supply, Inc. v. City of Seattle, 16 Wash.App. 265, 269-75, 555 P.2d 421 (1976) (law did not permit the city to negotiate privately with a selected bidder to lower the bidder's bid when a competitive bid is required under the law); Hanson Excavating Co. v. Cowlitz County, 28 Wash.App. 123, 125-27, 622 P.2d 1285 (1981) (a sewer construction contract negotiated after a competitive bid was void because a private negotiation circumvented the policy supporting a competitive bid). Thus, RCW 47.46.030 and the state bidding laws are mutually exclusive.
When construing two statutes pertaining to the same subject matter we assume that the legislature does not intend to create an inconsistency. Peninsula Neighborhood Ass'n, 142 Wash.2d at 342, 12 P.3d 134. Statutes are to be read together, whenever possible, to achieve a "`harmonious total statutory scheme ... which maintains the integrity of the respective statutes.'" Id. (quoting Employco Pers. Servs., Inc. v. City of Seattle, 117 Wash.2d 606, 614, 817 P.2d 1373 (1991)). Given this rule and the incompatibility of the statutes, the only way to read the PPI Act and the state bidding laws harmoniously is to read the PPI Act as creating an exemption for projects under the PPI Act from the requirements of the state bidding laws.
Because the original UIW agreement was lawfully executed we conclude that the amended UIW agreement, the Design-Build Agreement, and the personal service contracts were not subject to the state bidding laws.
IV. Referendum 49 bonds
CAT challenges the legality of the Referendum 49 bonds on two grounds. First, CAT argues that EHB 2723 turns the Referendum 49 bonds into revenue bonds in violation of RCW 47.10.846 by providing that toll revenues be used to pay off the Referendum 49 bonds. CAT asserts that the Referendum 49 bonds are a general obligation of this State that must be paid from the motor vehicle fund rather than revenue bonds and that toll revenue cannot be used to pay off the bonds without specifying an alternative means of payment. Then, CAT goes on to claim that (1) issuing the Referendum 49 bonds, which in fact are revenue bonds, without *386 voters' approval is a violation of article VIII, section 3 of the state constitution, (2) WSTC should have disclosed that the Referendum 49 bonds are in fact revenue bonds, and (3) EHB 2723 violated article II, section 37 of the state constitution, which prohibits enactment of legislation that revises or amends other acts without setting them forth at full length, by revising RCW 47.10.843.848 and turning the Referendum 49 bonds into revenue bonds. CONST. art. VIII, § 3; art II, § 37; Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 192, 11 P.3d 762, 27 P.3d 608 (2000).
In support of these arguments, CAT cites various statutes[11] that provide an alternative or additional means of paying bonds other than through taxes, pointing out that a sequence of statutes on the same general subject may provide insight as to legislative policy and intent. Morse v. City of Toppenish, 46 Wash.App. 60, 63, 729 P.2d 638 (1986). Then, CAT argues that the Referendum 49 bonds do not provide any alternative or additional means unlike the other bonds that CAT cites.
The bonds CAT cites are different from the Referendum 49 bonds. Revenues, other than tax revenues, directly pay off the bonds cited by CAT. In contrast, an excise tax on motor vehicle and special fuel, which creates the motor vehicle fund, directly pays off the Referendum 49 bonds. Toll revenues do not directly pay off the Referendum 49 bonds. Additionally, where bonds are paid from tax revenue, the bonds are a general obligation of the State, not revenue bonds. State ex rel. Wash. State Fin. Comm. v. Martin, 62 Wash.2d 645, 661, 384 P.2d 833 (1963). Here, Referendum 49 bonds are paid by an excise tax on motor vehicle and special fuels. Thus, as stated in RCW 47.10.846, the Referendum 49 bonds are a general obligation of the State, not revenue bonds. Thus, CAT's arguments on article VIII, section 3 and article II, section 37 of the Washington Constitution as well as its argument regarding disclosing the character of the Referendum 49 bonds are without merit.
Next, CAT argues that the State cannot use toll revenues to reimburse the motor vehicle fund, which pays off the Referendum 49 bonds because the toll revenues cannot be commingled with tax revenues. This is essentially an argument that the toll revenues cannot indirectly pay off the Referendum 49 bonds. CAT first relies on State ex rel. Washington Toll Bridge Authority v. Yelle, 195 Wash. 636, 82 P.2d 120 (1938). In that case, we found that a toll is not a tax and that toll revenues are not required to be paid into the state treasury. Id. at 647, 82 P.2d 120. However, the legislature's power to enact a statute is unrestrained except where, either expressly or by fair inference, it is prohibited by the state and federal constitution. State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 809, 982 P.2d 611 (1999); State ex rel. Distilled Spirits Inst., Inc. v. Kinnear, 80 Wash.2d 175, 180, 492 P.2d 1012 (1972).
Here, nothing in the Washington Constitution prohibits the legislature from enacting a statute that enables the toll revenues to be paid into the state treasury and eventually to reimburse the motor vehicle fund that pays off the Referendum 49 bonds. We conclude that the repayment provision of EHB 2723 does not violate RCW 47.10.846.
V. Priority Programming Statute
CAT argues that the State violated the priority programming statute by concluding the contracts related to the Tacoma Narrows Bridge project without a competitive bid. CAT claims that the priority programming statute requires that the contracts related to the Tacoma Narrows Bridge project be let according to state bidding laws.
The priority programming statute is completely silent as to whether contracts for highway projects must go through the process *387 specified in the state bidding statutes. Under the priority programming statute, WSTC must prioritize various projects for preserving or improving state highways by using certain selection criteria. RCW 47.05.051. The intent of the statute is to allow the State to efficiently improve the state highway system with limited funds. RCW 47.05.010. As mentioned earlier, the PPI Act establishes a new contracting process for a limited number of transportation projects. Under the process established by the PPI Act, private entities undertake all or a portion of the study, planning, design, construction, operation, and maintenance of the systems and facilities. RCW 47.46.010,.030. We see no conflict between the priority programming statute and the alternative bidding process under the PPI Act. Both statutes aim at achieving efficiencies in developing transportation improvement projects. The priority programming statute does not address the question of whether the contracts related to the Tacoma Narrows Bridge project must comply with the state bidding laws. Moreover, the legislature is not bound by the priorities set under the priority programming statute, which apply only to WSTC.
VI. Washington Constitution article II, section 19
Article II, section 19 of the state constitution provides:
No bill shall embrace more than one subject, and that shall be expressed in the title.
CONST. art. II, § 19. This is to be liberally construed in favor of upholding the legislation. Amalgamated Transit, 142 Wash.2d at 206, 11 P.3d 762; Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 555, 901 P.2d 1028 (1995).
There are two distinct prohibitions in article II, section 19. Amalgamated Transit, 142 Wash.2d at 207, 11 P.3d 762; Patrice v. Murphy, 136 Wash.2d 845, 852, 966 P.2d 1271 (1998). The first is that no bill shall embrace more than one subject (the single-subject rule). The purpose of this prohibition is to prevent logrolling or pushing legislation through by attaching it to other necessary or desirable legislation. Amalgamated Transit, 142 Wash.2d at 207, 11 P.3d 762; Power, Inc. v. Huntley, 39 Wash.2d 191, 198, 235 P.2d 173 (1951); State v. Broadaway, 133 Wash.2d 118, 124, 942 P.2d 363 (1997). The second prohibition is that no bill shall have a subject which is not expressed in its title (the subject-in-title rule). The purpose of this prohibition is to notify members of the legislature and the public of the subject matter of the measure. Amalgamated Transit, 142 Wash.2d at 207, 11 P.3d 762; Power, 39 Wash.2d at 198, 235 P.2d 173; Broadaway, 133 Wash.2d at 124, 942 P.2d 363.
Here, CAT asserts that EHB 2723 violates the single-subject rule because there is no "rational unity" between the provisions of EHB 2723 which relate to public financing for specific projects and an exemption for all-state issued project contracts from the state bidding laws. In asserting the violation of the single-subject rule, CAT assumes that EHB 2723 creates a new exemption from the state bidding laws for the Tacoma Narrows Bridge project. In fact, the PPI Act, not the amendments, create an exemption from the process under the state bidding laws for the Tacoma Narrows Bridge project. As discussed above, EHB 2723 merely clarifies that any agreement related to Tacoma Narrows Bridge project executed after the original UIW agreement will be exempt from additional solicitation requirements. In other words, EHB 2723 does not change the selection process for the Tacoma Narrows Bridge project. CAT's argument fails.
CAT's second contention is that EHB 2723 violates article II, section 19 of the state constitution because the title of EHB 2723 fails to provide notice that any and all WSDOT issued contracts under the publicly funded Tacoma Narrows Bridge project would be exempt from the state bidding laws.
Again, CAT's argument assumes that EHB 2723 creates a new exemption from the process under the state bidding laws for the Tacoma Narrows Bridge project. As discussed above, that is not the case. Since EHB 2723 does not change the procurement method described by the PPI Act, there is no need to include reference to the process in *388 the bill title. EHB 2723 does not violate the subject-in-title prong of article II, section 19 of the state constitution.

CONCLUSION
We hold that the trial court did not err in granting the State's motion for an order shortening time to hear its motion for summary judgment. We also hold that the State did not violate the state bidding laws in the Tacoma Narrows Bridge project. We further hold that the State did not violate the priority programming statute by concluding the contracts related to the Tacoma Narrows Bridge project without a competitive bid. Finally, we hold that EHB 2723 does not violate article II, section 19 of the Washington Constitution. We affirm the judgment of the trial court.
ALEXANDER, C.J., and JOHNSON, IRELAND, BRIDGE, CHAMBERS, OWENS, FAIRHURST, JJ., concur.
SANDERS, J. (dissenting).
The majority's affirmance of this cripplingly shortened summary judgment notice illuminates a disturbing trend in which courts of this state seem to rubber stamp any request by the government to fast track challenges to the expenditure of public funds. I, for one, cannot let this pass unnoticed.
In King County v. Taxpayers of King County, 133 Wash.2d 584, 949 P.2d 1260 (1997), this court upheld King County's issuance of bonds to finance what is now Safeco Field. Analogous to this case, yet less egregious, the litigation there spanned a mere 36 days from the commencement of the lawsuit to the order granting summary judgment. See id. at 592-93, 949 P.2d 1260. I stated my reservations about such a railroad to dismissal:
[H]aste makes waste; the best lawyers are often deprived of an adequate opportunity to represent the interests of their clients if denied sufficient time; and courts sometimes commit error which could be avoided given an adequate opportunity to study the law, discern the facts, think, and reflect. A rush to judgment defeats justice.
Id. at 615, 949 P.2d 1260 (Sanders, J., dissenting).
While the summary judgment notice in Taxpayers of King County was shortened from 28 days to 26 days, see id. at 592-93, 949 P.2d 1260, here the notice was shortened from 28 days to 8 days, according the responding party only 6 days to provide all necessary memoranda of law and responsive affidavits in this complex litigation involving millions of dollars of public expenditures. This trial court's decision to place appellant Citizens Against Tolls (CAT) on a "rocket docket"[1] to dismissal exemplifies what I perceive to be an abdication of the judiciary's ultimate responsibility to ensure the citizens' right to an impartial and just adjudication of their claims.
The civil rule governing summary judgment plainly provides a minimum summary judgment notice of 28 days, without exception. See CR 56(c) ("The motion and any supporting affidavits, memoranda of law, or other documentation shall be filed and served not later than 28 calendar days before the hearing." (emphasis added)). "Shall" is unequivocally mandatory language. Erection Co. v. Dep't of Labor & Indus., 121 Wash.2d 513, 518, 852 P.2d 288 (1993). Even if we were to invent an exception to an otherwise clear rule, I posit the movant must at least demonstrate good cause for such a request.[2]See generally 14A KARL B. TEGLAND, *389 WASHINGTON PRACTICE: CIVIL PROCEDURE § 22.8, at 8 (1st ed.2003). The State's sole asserted reason here for shortening the 28-day limit to 8 days was to "comfort" itself upon issuance of the Referendum 49 bonds on September 18, 2002. So much is evident from the trial court hearing (itself on only a few hours' notice) addressing the oral motion to shorten time:[3]
THE COURT: Can I ask you a question with finality? [sic] Clearly, as you understand the last time the Narrows Bridge issue came before me I ruled in favor of the Department of Transportation and was reversed by the Supreme Court, so even if I rule in your favor and say that this suit has no merit as a matter of law, how is that going to give any more assurances to bond counsel and/or purchasers of bonds than would be the case if this lawsuit were just judged on its own merits by attorneys looking to see whether or not there was any arguable merit in the case notwithstanding what I might do or not do?
MS. CADE [State's attorney]: That's true, Your Honor, but I think that they [the state finance committee] would be way more comfortable in taking that risk and making that decision if there were a Superior Court ruling on this case ... [T]hey feel more secure in selling $250 million in state bonds to at least have a Superior Court decision on the case.
Verbatim Report of Proceedings (VRP) (Sept. 3, 2002) at 8-9 (emphasis added). At the time the trial court granted the motion to shorten time, it was unclear whether the State would ultimately prevail over CAT's lawsuit, but the motion to shorten time presumed that eventuality was a foregone conclusion. The entire basis for the motion to shorten time centered on the finance committee's desire to "be way more comfortable" with a superior court decision in its favor before issuing the bonds five days after the ruling dismissing CAT's lawsuit. Id. at 9. The parties and trial court were all well aware of the inevitable appellate review, yet the court agreed with the State and elected to race through the proceedings to ensure dismissal of CAT's claim as a mere formality. Clerk's Papers at 69-70.
Summary judgment carries a judicial determination that one litigant has no evidence or legal entitlement to support its claim. See Babcock v. State, 116 Wash.2d 596, 599, 809 P.2d 143 (1991) ("Summary judgment exists to examine the sufficiency of legal claims and narrow issues, not as an unfair substitute for trial."), quoted in City of Seattle v. State, 136 Wash.2d 693, 697, 965 P.2d 619 (1998). A litigant has at least 17 days to file briefing and affidavits in opposition to a motion for summary judgment. CR 56(c). This time frame is greater than that applicable to other motions, cf. CR 6(d) properly so, considering the inherent dispositive effect of summary judgment. And the rule expressly provides that response time may be extended. See CR 56(f).
I posit when a litigant faces the potential summary dismissal of his or her claim the trial court must be ever vigilant in its duty to ensure each claim is properly decided on its merits. This is especially true with a citizen's lawsuit against the government's unlawful use of taxpayer dollars. In such a case I reject the claim the trial court has the discretionary authority to fast forward the proceedings to the finish line just to make the State "feel" better. This suggests an overt judicial partiality which favors the State over the private citizen litigant corrosive *390 to public support and confidence in an independent judiciary.
I also note the State claimed it needed to speed the process to dismiss because it is "hard to schedule" the state finance committee in the same place at the same time to sell Referendum 49 bonds. VRP (Sept. 3, 2002) at 17; see also RCW 43.33.010 (state finance committee consists of governor, lieutenant governor, and treasurer); RCW 47.10.844 (state finance committee must supervise sale of Referendum 49 bonds). However even if a reschedule was desirable, certainly it was not compelled. Moreover if the Tacoma Narrows Bridge project is truly one which "is essential for the economic, social, and environmental well-being of the state," RCW 47.46.010, is it not unreasonable to expect those responsible public officials to adjust their calendars to allow independent assurance that the legal rights of the citizens of this state are properly respected?
I would therefore reverse this dismissal and return this case to the trial court with an express order to observe the notice requirements mandated by CR 56. Because the majority turns its back on the citizens' right to fair notice, I dissent.
NOTES
[1] RCW 47.20.780 states:

Design-buildCompetitive bidding. (Expires April 30, 2008.) The department of transportation shall develop a process for awarding competitively bid highway construction contracts for projects over ten million dollars that may be constructed using a design-build procedure. As used in this section and RCW 47.20.785, "design-build procedure" means a method of contracting under which the department of transportation contracts with another party for the party to both design and build the structures, facilities, and other items specified in the contract.
[2] At the oral argument, counsel for CAT argued that the agreement between WSDOT and UIW had been terminated on July 16, 2002. However, WSDOT and UIW did not terminate the original UIW agreement. They simply modified it.
[3] The trial court rejected this claim. CP at 826. It was not raised before this court.
[4] CR 56(f) states:

When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot, for reasons stated, present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
The State argues that CAT did not file an affidavit required under CR 56(f). However, the trial court's ruling on CR 56(f) is discretionary. Thus, the review is governed by the manifest abuse of discretion standard, regardless of whether affidavits are filed. In re Dependency of E.S., 92 Wash. App. at 769, 964 P.2d 404; Coggle, 56 Wash.App. at 504, 784 P.2d 554. CAT still must show prejudice to overturn the ruling. Zimny, 59 Wash.App. at 740, 801 P.2d 259.
[5] This opinion was later withdrawn and replaced. Martel v. County of Los Angeles, 56 F.3d 993 (9th Cir.1995). The court held that the plaintiff had failed to establish the prejudice required to overturn the trial court's denial of its continuance motion. Id.
[6] In addition to asserting that the trial court erred in granting the State's motion for an order shortening time to hear its motion for summary judgment, CAT claims that the trial court failed to strike several newspaper articles and press releases attached to declarations in support of the State's motion for summary judgment. This ruling is also discretionary. Thus, CAT must show manifest abuse of discretion. In re Dependency of E.S., 92 Wash.App. at 769, 964 P.2d 404; Coggle, 56 Wash.App. at 504, 784 P.2d 554. However, CAT does not advance any argument showing such manifest abuse of discretion. Accordingly, we conclude that the trial court did not err in not striking these newspaper articles and press releases.
[7] RCW 47.28.120 states:

Actions for labor and materialsLimitation of action. Any contracting person, firm, or corporation performing any labor or furnishing any materials upon their contract or otherwise for public work or improvement under the direction of the department or any person claiming any right of action upon any such contract with the state of Washington or who claims a cause of action against the state of Washington arising out of any such contract must bring such suit in the proper court in Thurston county before the expiration of one hundred and eighty days from and after the final acceptance and the approval of the final estimate of such work by the department; otherwise the action is forever barred.
[8] Section 13 of EHB 2723 states:

A new section is added to chapter 47.46 RCW to read as follows:
ALTERATION DOES NOT CONSTITUTE NEW PROPOSAL. If a proposal is or has been selected for the design, development, construction, maintenance, or operation of transportation systems or facilities under this chapter, subsequent agreements may be made to implement portions of the proposal that modify the proposal or that do not incorporate all the features of the proposal. Any such modified agreement does not require the solicitation or consideration of additional proposals for all or any portion of the services rendered under that modified agreement. Modified agreements may provide for the reimbursement of expenses and fees incurred under earlier agreements.
[9] Id.
[10] Section 1 of EHB 2723 states:

INTENT. The legislature finds that greater flexibility to provide state financing for projects developed under chapter 47.46 RCW will result in better use of public resources, lower financing costs, and potential savings to taxpayers. The legislature intends to: Clarify the ability of the department of transportation to use public and private financing for projects selected and developed under chapter 47.46 RCW; provide the department with specific means of state financing where that financing is in the public's best interest; provide citizens living in the impacted areas a statutory mechanism to review proposed toll rates and provide input before adoption of toll schedules by the toll authority; and prevent unreasonable delay of critical transportation projects that are essential for public safety and welfare.
[11] RCW 43.99Q.060; RCW 43.99P.060; RCW 43.99L.070; RCW 43.99K.040; RCW 43.99J.040; RCW 43.99I.070; RCW 43.99G.080; RCW 43.83F.050; RCW 43.83D.100; RCW 43.83C.100; RCW 43.83B.100; RCW 43.83A.100; ch. 43.83 RCW; RCW 43.99Q.110; RCW 43.99Q.160; RCW 43.99N.080; RCW 43.99F.090; RCW 43.99E.050; RCW 43.99D.050; RCW 43.99C.055; RCW 43.99B.022; RCW 43.99B.038; RCW 43.99A.090; RCW 43.96B.230.
[1] Martel v. County of Los Angeles, 56 F.3d 993, 1003 (9th Cir.1995) (Kleinfeld, J., dissenting).
[2] I note the majority cites no case which expressly considered a motion to shorten the summary judgment notice requirements holding a trial court has the inherent discretion to do so. See majority at 10 (citing Loveless v. Yantis, 82 Wash.2d 754, 513 P.2d 1023 (1973); In re Dependency of E.S., 92 Wash.App. 762, 964 P.2d 404 (1998); Zimny v. Lovric, 59 Wash.App. 737, 801 P.2d 259 (1990); Coggle v. Snow, 56 Wash.App. 499, 784 P.2d 554 (1990)). Each of the cited cases addressed the discretion a trial court has to shorten the time frame provided in CR 6 for nondispositive motions. It seems only one Washington case has addressed the propriety of considering summary judgment on a shortened schedule, however even there the hearing was actually held more than 28 days after filing and service. Cole v. Red Lion, 92 Wash.App. 743, 749, 969 P.2d 481 (1998). CR 6(d) by its terms does not apply to summary judgments but rather motions normally brought on five days' notice:

A written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than 5 days before the time specified for the hearing, unless a different period is fixed ... by order of the court. Such an order may for cause shown be made on ex parte application.
[3] Though the order granting the WSDOT's motion to shorten time referenced the declarations of Amy Arnis and Linea Laird, those declarations were not even dated, much less filed with the court, until after the order was entered. See Clerk's Papers (CP) at 69-70 (order shortening time, dated and filed on Sept. 3, 2002); CP at 152-53 (Arnis declaration, dated and filed on Sept. 5, 2002); CP at 800-02 (Laird declaration dated September 5, 2002 and filed Sept. 11, 2002). Moreover neither of these declarations made any claim that shortening the usual notice requirements was appropriate, much less absolutely necessary.