[No. 41138-5-II.   Division Two.   February 29, 2012.]

MARY MASON, *Appellant*, v. GEORGIA-PACIFIC CORPORATION, *Respondent*, THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.

*Jill A. Karmy* (of *Parham, Hall & Karmy*), for appellant Mary Mason.

*Robert M. McKenna, Attorney General*, and *Natalee R. Fillinger, Assistant*, for appellant Department of Labor and Industries.

*James L. Gress* (of *The Law Office of Gress & Clark*), for respondent.

¶1 JOHANSON, J. — Mary Mason and the Department of Labor and Industries (Department) appeal the superior court's calculation of her surviving spouse pension under the Industrial Insurance Act, Title 51 RCW. Mary[1] and the Department primarily argue that (1) the legislature intended to provide wage based death benefits to survivors of voluntarily retired workers who die from occupational diseases and (2) because former RCW 51.32.050 (1986) conflicts with RCW 51.32.180, the conflict should be resolved in favor of the survivor. We reverse the superior court and hold that Mary's survivor benefits should be based on her deceased husband's wages at the time he retired.

[1] For clarity, we refer to the Masons by their first names. We intend no disrespect.

FACTS

¶2 William D. Mason worked for Georgia-Pacific Corporation for more than 35 years until his voluntary retirement on April 30, 1986. Working mostly as a millwright, William was extensively exposed to caustic chemicals, including asbestos and chlorine dioxide. In June 1988, William filed a claim for industrial insurance benefits based on a bilateral lung condition related to chemical exposure during his employment. The Department accepted the claim.

¶3 William died in December 2006. Mary, his wife of many years, survived him. His claim for industrial insurance benefits was still open at the time of his death. In April 2007, the Department found that an occupationally related condition caused Mason's death and approved surviving spouse benefits. In July, the Department determined that the appropriate date for the manifestation of William's occupationally related condition was the last day he worked (April 30, 1986), and established a surviving spouse pension based on his last day of work wages.

¶4 Georgia-Pacific protested the Department's manifestation date for William's occupationally related condition, but the Department affirmed the order. Georgia-Pacific appealed to the Board of Industrial Insurance Appeals, which affirmed the order.

¶5 Both Mary and Georgia-Pacific appealed to superior court, which consolidated their appeals.[2] At trial, Georgia-Pacific argued that Mary was entitled to benefits calculated using the statutory minimum survivor pension rate because William had voluntarily retired before his lung condition manifested.

¶6 Based on the jury's finding that William's condition did not manifest until after his voluntary retirement, the

---

[2] The issues Mary appealed to superior court are not appealed here.

trial court determined, as a matter of law, that RCW 51.32.180 required Mary's survivor benefits to be set at the statutory minimum. The trial court reversed and remanded, directing the Department to grant a spousal pension to Mary using the statutory minimum rate to calculate the pension amount and to close the claim. Both the Department and Mary appeal.

## ANALYSIS

### I. STANDARD OF REVIEW

¶7 Unlike our review of other administrative decisions, we review workers' compensation cases appealed from superior court in the same way we review nonadministrative civil cases. RCW 51.52.140; *Rogers v. Dep't of Labor & Indus.*, 151 Wn. App. 174, 180, 210 P.3d 355, *review denied*, 167 Wn.2d 1015 (2009).[3] The superior court's construction of a statute is a question of law, which we review de novo. *Jacobsen v. Dep't of Labor & Indus.*, 127 Wn. App. 384, 389, 110 P.3d 253 (2005), *review denied*, 156 Wn.2d 1024 (2006). Here, the parties do not dispute the facts and the only question is one of statutory construction, a question of law.

¶8 If a statute's meaning is plain on its face, then we give effect to that plain meaning as an expression of legislative intent. *State ex rel. Citizens Against Tolls (CAT) v. Murphy*, 151 Wn.2d 226, 242, 88 P.3d 375 (2004). We discern plain meaning not only from the provision in question but also from closely related statutes and the underlying legislative purposes. *Murphy*, 151 Wn.2d at 242. In contrast, when a statute is susceptible to more than one reasonable interpretation, it is ambiguous and we use canons of statutory construction or legislative history. *Dep't*

---

[3] Under RCW 34.05.030(2)(a), the judicial review provisions of the Administrative Procedure Act, chapter 34.05 RCW, do not apply "[t]o adjudicative proceedings of the board of industrial insurance appeals except as provided in RCW 7.68.110 and 51.48.131."

*of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 12, 43 P.3d 4 (2002). We consider and harmonize statutory provisions in relation to each other and interpret a statute to give effect to all statutory language. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 560, 14 P.3d 133 (2000). We avoid construing a statute in a manner that results in "unlikely, absurd, or strained consequences." *Glaubach v. Regence BlueShield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003).

■■ ¶9 Washington's Industrial Insurance Act "is remedial in nature and is to be liberally construed in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker." *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987). Regarding statutory interpretation, our fundamental objective is to give effect to the legislature's intent. *Campbell & Gwinn*, 146 Wn.2d at 9-10.

## II. LEGISLATIVE INTENT OF SURVIVOR BENEFITS

### A. Expressio Unius Est Exclusio Alterius

■ ■ ¶10 Under the maxim expressio unius est exclusio alterius—where a statute specifically designates the things or classes of things on which it operates—an inference arises in law that the legislature intentionally omitted all things or classes of things omitted from it. *Wash. Natural Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County*, 77 Wn.2d 94, 98, 459 P.2d 633 (1969).

¶11 The 1986 act provided to workers and their families four types of wage-based, periodically paid monetary benefits. These benefits included permanent total disability pension benefits,[4] temporary total disability time loss com-

---

[4] Former RCW 51.32.060 (1986).

pensation,[5] loss of earning power benefits (also known as partial time loss compensation),[6] and death benefits.[7] In 1986, the legislature amended three of the four wage-based, periodically paid monetary benefits. The amendments provided that if the worker voluntarily retires then "benefits shall not be paid." Former RCW 51.32.060, .090(1), (3). But the legislature did not amend the fourth provision, which provided death benefits to the worker's survivors.

¶12 Georgia-Pacific argues that we should not assume that the legislature "knew what it was doing" because there is no legislative history that expressly articulates a purposeful omission of a similar provision to the death benefit. Br. of Resp't at 20. However, one rule of statutory construction is that the court presumes the legislature to be familiar with its own law, including prior subjects of legislation, the rules, and court decisions construing the former legislation. *In re Wissink*, 118 Wn. App. 870, 875, 81 P.3d 865 (2003). Additionally, no legal authority supports Georgia-Pacific's argument requiring express evidence of legislative intent.

¶13 Georgia-Pacific also argues that RCW 51.32.050, the provision that restricts the benefits of a worker who voluntarily retires, is not an example of "classes of things" referred to by the maxim expressio unius est exclusio alterius. Br. of Resp't at 22. Georgia-Pacific seeks to narrow the application of the maxim to parallel "classes of things" identified in previous case law. Br. of Resp't at 22. This argument misunderstands the maxim. Instead, the various types of benefits available to retired workers under the act

---

[5] Former RCW 51.32.090(1) (1986).

[6] Former RCW 51.32.090(3) (1986).

[7] Former RCW 51.32.050 provides:

    (2) (a) Where death results from the injury, a surviving spouse of a deceased worker eligible for benefits under this title shall receive monthly for life or until remarriage payments according to the following schedule:

      (i) If there are no children of the deceased worker, sixty percent of the wages of the deceased worker but not less than one hundred eighty-five dollars.

are types or classes of a thing to which we apply the maxim expressio unius est exclusio alterius.

¶14 The principle of expressio unius est exclusio alterius is "the law in Washington, barring a clearly contrary legislative intent." *City of Algona v. Sharp*, 30 Wn. App. 837, 842, 638 P.2d 627 (1982). Applying it here, we infer that by amending the language regarding three out of four wage-based, periodically paid monetary benefits, the legislature intentionally omitted a similar limitation to survivors' death benefits.

### B. Unique Character of Death Benefit

¶15 Mary and the Department argue that a surviving spouse's lifetime pension is different in character from the worker's wage replacement benefits. Specifically, they argue that a worker can choose to resume work, thereby reversing his or her voluntary retirement; but a surviving spouse does not have the ability to reverse the voluntary retirement of his or her deceased spouse. Second, a worker cannot waive the survivor's rights to benefits. Georgia-Pacific argues that death benefits merely extend the worker's wage replacement benefits to the spouse and the legislative purpose of the survivor's death benefit is the same as the worker's wage replacement benefit. We agree with Mary and the Department.

¶16 Although the legislature made no express statement, it is reasonable to conclude that the legislature intended to provide different benefits for workers and survivors. The Department's regulations provide a means for a worker to reverse voluntary retirement; however, no means exist for a survivor to reverse his or her deceased spouse's retirement. WAC 296-14-100(1)(b) (voluntary retirement is negated by evidence showing the worker's "bona[ ]fide attempt to return to work after retirement"). In addition, our Supreme Court has held that "the worker cannot waive the survivor's rights to benefits." *Kilpatrick v.*

*Dep't of Labor & Indus.*, 125 Wn.2d 222, 228, 883 P.2d 1370, 915 P.2d 519 (1994). *Kilpatrick* supports the argument that the survivor's death benefit has a separate character and is not merely an extension of the worker's wage replacement benefit.

¶17 Although Georgia-Pacific correctly argues that the Act does not entitle voluntarily retired workers who subsequently become disabled (either temporarily or permanently) to receive wage replacement benefits, it asserts without explanation that the survivor's death benefit is merely an extension of the worker's wage replacement benefit. Regarding worker's benefits, Division Three of this court established that temporary disability benefits are not available to a voluntarily retired worker. *Kaiser Aluminum & Chem. Corp. v. Overdorff*, 57 Wn. App. 291, 297, 788 P.2d 8 (1990). Similarly, Division One of this court concluded that permanent total disability benefits are not available to a voluntarily retired worker. *Weyerhaeuser Co. v. Farr*, 70 Wn. App. 759, 763-64, 855 P.2d 711 (1993), *review denied*, 123 Wn.2d 1017 (1994). Both cases determined that the voluntarily retired person no longer earns wages, and thus cannot suffer wage loss, and the legislature intended the benefit to protect the worker from wage loss. *Farr*, 70 Wn. App. at 763; *Overdorff*, 57 Wn. App. at 296-97. Georgia-Pacific neither addresses nor explains why the survivor's death benefit should have the same purpose and limitations as the worker's wage replacement benefits. Georgia-Pacific's argument overlooks the fact that a worker's benefit benefits the worker and a survivor's benefit benefits the survivor.

¶18 We agree with Mary and the Department that the legislature intended to treat death benefits differently than wage replacement benefits.

### III. Conflict of Statutes

¶19 Mary and the Department argue that former RCW 51.32.050[8] (which bases death benefits on the deceased worker's wages) conflicts with RCW 51.32.180(b)[9] (which commences compensation for occupational diseases at time of manifestation). The conflict exists when a worker's occupational disease manifests during voluntary retirement and the worker has no current wages on which to base death benefits. Mary and the Department argue that when statutes conflict, specific statutes control over general ones, and we construe the conflict in the worker's favor. Georgia-Pacific responds that the statutes do not conflict and are unambiguous, mandating a plain meaning approach to statutory construction. We agree with Mary and the Department.

¶20 As an initial matter, we reject Georgia-Pacific's assertion that no conflict exists between former RCW 51.32.050 and RCW 51.32.180(b). Georgia-Pacific argues

---

[8] Former RCW 51.32.050 provides:

> (2) (a) Where death results from the injury, a surviving spouse of a deceased worker eligible for benefits under this title shall receive monthly for life or until remarriage payments according to the following schedule:
>
> (i) If there are no children of the deceased worker, sixty percent of the wages of the deceased worker but not less than one hundred eighty-five dollars.

[9] RCW 51.32.180 provides:

> Every worker who suffers disability from an occupational disease in the course of employment under the mandatory or elective adoption provisions of this title, or his or her family and dependents in case of death of the worker from such disease or infection, shall receive the same compensation benefits and medical, surgical and hospital care and treatment as would be paid and provided for a worker injured or killed in employment under this title, except as follows: (a) [(1)] This section and RCW 51.16.040 shall not apply where the last exposure to the hazards of the disease or infection occurred prior to January 1, 1937; and (b) [(2)] for claims filed on or after July 1, 1988, the rate of compensation for occupational diseases shall be established as of the date the disease requires medical treatment or becomes totally or partially disabling, whichever occurs first, and without regard to the date of the contraction of the disease or the date of filing the claim.

(Alterations in original.)

that based on a plain language reading, the statutes are not in conflict because a retired person, who does not actively earn wages, has a wage rate of zero.

¶21 Former RCW 51.32.050 bases a death benefit on the worker's wages.[10] *See supra* note 8. But RCW 51.32.180(b) establishes that compensation for occupational diseases commences at the time the disease became manifest. *See supra* note 9. If a worker's occupational disease manifests during voluntary retirement when the worker does not actively earn wages, the statutes conflict.

¶22 Additional conflict between these statutes involves the legislature's general intent that the act treats workers who have an occupational disease the same as workers who have an employment injury. Specifically, RCW 51.32.180 provides that "[e]very worker who suffers disability from an occupational disease in the course of employment . . . shall receive the same compensation benefits . . . as would be paid and provided for a worker injured or killed in employment . . . except . . . the rate of compensation for occupational diseases shall be established as of the date the disease requires medical treatment." Similarly RCW 51.16.040 requires that workers who have an occupational disease be compensated and paid "in the same manner" as workers with employment injuries.[11]

¶23 Under Georgia-Pacific's interpretation, the occupationally *injured* worker who voluntarily retires[12] and then

---

[10] In 2007, the legislature amended RCW 51.32.050 by striking the minimum rate of $185 and linking the minimum benefit amount to a percentage of the state's average monthly wage. Although industrial insurance benefits are paid based on the schedule in effect on the date of worker's injury, subsequent legislative history supports Mary's argument that the legislature intended the death benefit to be linked to the worker's wages.

[11] RCW 51.16.040 (Occupational diseases) provides:

The compensation and benefits provided for occupational diseases shall be paid and in the same manner as compensation and benefits for injuries under this title.

[12] An occupationally injured worker "voluntarily retire[s]" if the injured worker is capable of obtaining and performing some form of gainful employment other

dies leaves a survivor who will receive wage-based death benefits. But the occupationally *diseased* worker who voluntarily retires and then dies leaves a survivor who will receive only the minimum death benefit (non-wage-based death benefit).

¶24 We consider and harmonize statutory provisions in relation to each other and interpret a statute to give effect to all statutory language. *Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d at 560. We avoid construing a statute in a manner that results in "unlikely, absurd, or strained consequences." *Glaubach*, 149 Wn.2d at 833. When statutes conflict, specific statutes control over general ones. *Hallauer v. Spectrum Props., Inc.*, 143 Wn.2d 126, 146-47, 18 P.3d 540 (2001).

¶25 In this case, the statutes conflict. Comparing these statutes, former RCW 51.32.050 applies specifically to death benefits and, in contrast, RCW 51.32.180(b) is more general because it applies to all benefits based on claims for occupational diseases. Because the statutes conflict, the more specific "death benefit" provision controls the more general "occupational diseases" statute. *Hallauer*, 143 Wn.2d at 146. Under this interpretation, both the employment-*injured* worker's survivors and the occupationally *diseased* worker's survivors receive wage-based death benefits. This interpretation harmonizes the statutory provisions to give effect to all statutory language. Finally, the act "is remedial in nature and is to be liberally construed in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker." *Dennis*, 109 Wn.2d at 470. Therefore, when " 'reasonable minds can differ over what Title 51 RCW provisions mean . . . , the benefit of the doubt belongs to the injured worker.' " *Harry v. Buse Timber & Sales, Inc.*, 166 Wn.2d 1, 8, 201 P.3d 1011 (2009) (altera-

than the job that injured the worker, but the injured worker chooses to retire instead of pursuing these options. *See* WAC 296-14-100 (defining a voluntarily retired worker).

tion in original) (quoting *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 811, 16 P.3d 583 (2001)). Here, neither party contests the Department's finding that employment conditions caused William's death. A core purpose of the act is to motivate employers to make workplaces safer by allocating the cost of workplace injuries to the industry that produces them. *Harry*, 166 Wn.2d at 19.

¶26 We conclude that because the statutes conflict, specific statutes control over general ones, and ambiguous statutes are construed in favor of the worker, Mary's survivor benefits should be based on William's wages at the time of his retirement.

## IV. ATTORNEY FEES

¶27 Mary and the Department request an award of attorney fees and costs under RCW 51.52.130 and RCW 4.84.010, which authorize assessed attorneys fees and costs when a party prevails on appeal.[13] Because we reverse the superior court's decision, both Mary and the Department are entitled to attorney fees and costs. RAP 18.1.

¶28 We reverse.

HUNT and VAN DEREN, JJ., concur.

Review denied at 174 Wn.2d 1015 (2012).

---

[13] In their reply brief Mary and the Department abandon their request for superior court attorney fees and costs.