IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MARK HANNA and JENNIFER HANNA, husband and wife, | ) ) ) | No. 39077-2-III |
| Respondents, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| ALLAN MARGITAN and GINA MARGITAN, husband and wife, | ) ) ) ) | |
| Appellants. | ) ) | |

LAWRENCE-BERREY, C.J. — Allan and Gina Margitan appeal the trial court's enforcement of their settlement agreement. We affirm.

## FACTS

Mark and Jennifer Hanna and Allan and Gina Margitan are neighbors in Nine Mile Falls. The Margitans own two parcels of land, one on either side of the Hannas' parcel. The Margitans desire to use one of the parcels, parcel 3, as a rental property. According to Mr. Margitan, the water line servicing parcel 3 was leaking and otherwise noncompliant with plat requirements, and thus needed to be replaced. The Margitans have a road and utility easement across the Hannas' property.

On July 9, 2019, Mr. Margitan drove an excavator onto the Hannas' land and began digging a hole in the easement. Mr. Margitan later claimed he was digging "to determine if there was enough spacing" between the Hannas' abandoned septic drain field and his leaking water line "to install a new drinking water line and data cable." Clerk's Papers (CP) at 54. While digging, Mr. Margitan struck and broke an underground geothermal pipe, a "critical component of the Hannas' . . . heating/cooling system." *Id.* at 4. Unable to control the temperature of their home, the Hannas hired contractors to fix the broken geothermal line. When the contractors arrived, Mr. Margitan confronted them, threatening to sue if they damaged his utilities. Apparently perturbed by Mr. Margitan's vehement threats of litigation, the contractors refused to repair the Hannas' pipe.

The Hannas subsequently sued the Margitans (hereinafter the "2019 action"), asking the superior court to enjoin the Margitans from further interfering with the Hannas' repair of their geothermal line. The Hannas' complaint also sought damages for nuisance and trespass.

The Margitans, represented by counsel, answered the Hannas' complaint in the 2019 action by denying certain allegations and asserting affirmative defenses. The Margitans also brought several counterclaims. First, they alleged the Hannas had "interfere[d] with . . . their easement," seeking both damages and injunctive relief.

CP at 26, 224. Specifically, the Margitans contended the Hannas' geothermal line and abandoned septic drain field were "encroachments" on the easement that needed to be removed. *Id.* at 26, 224.

Next, the Margitans brought a nuisance counterclaim, primarily claiming that the proximity of the Hannas' geothermal line to the Hannas' new septic system created "noxious and foul odors."[1] *Id.* at 27, 225. The Margitans also contended the Hannas had created a nuisance through the filing of "serial legal actions." *Id.* at 227. Finally, the Margitans alleged the Hannas intentionally damaged the easement by grading and plowing rock toppings that the Margitans had placed on the road. The Hannas answered the Margitans' counterclaims and asserted affirmative defenses of their own.

The superior court granted the Hannas' motion for a preliminary injunction, enjoining the Margitans from further interfering with the Hannas' repair of their geothermal line through threats to sue the Hannas' contractors.[2] The court required the Hannas to post a $2,500 bond with the court clerk, protecting the Margitans in the event the Hannas' contractors damaged the Margitans' utilities.

---

[1] The nuisance counterclaim also encompassed the Margitans' allegations that the Hannas "allowed their dogs to aggressively chase [the Margitans]" and "place[d] their dog's feces on the easement." CP at 227.

[2] At the preliminary injunction hearing, the superior court corrected a false assertion from the Margitans' counsel that the Hannas were suing to prevent the Margitans from installing a replacement water line.

Injunction in place, the Hannas' contractors excavated and repaired the broken geothermal line. "Given that the repair work authorized by the . . . injunction was performed . . . without incident," the Hannas requested a release of the $2,500 bond back to them. CP at 130. The Margitans opposed the release of the bond amount, baldly asserting that the mere presence of the Hannas' geothermal line interfered with their use of the easement. The superior court granted the Hannas' motion to release the bond, and, on the Hannas' motion, imposed CR 11 sanctions on Mr. Margitan.

The repairs to their geothermal system complete, the Hannas stipulated to the dismissal of their affirmative claims in the 2019 action, leaving only the Margitans' counterclaims remaining. The Hannas moved for partial summary judgment on the counterclaims. The Hannas sought dismissal of the Margitans' claims for interference with the easement and nuisance insofar as they were based on the mere presence of the Hannas' abandoned drain field and geothermal line within the easement. The superior court granted the motion, agreeing with the Hannas that Mr. Margitan's theory undergirding these claims was barred by res judicata and collateral estoppel.[3] The court

---

[3] The superior court reasoned that we had already rejected the Margitans' legal theory that the mere presence of the Hannas' utilities within the easement impaired the Margitans' ability to use the easement. *See Margitan v. Spokane Reg'l Health Dist.*, No. 34746-0-III, slip op. at 10-12 (Wash. Ct. App. Jul. 24, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/347460_unp.pdf.

also summarily dismissed the Margitans' counterclaim for "serial litigation," and sanctioned the Margitans, calling it a "baseless claim." CP at 1106.

Parallel to the 2019 action, Mr. Margitan sued the Hannas and their counsel[4] in a separate action in November 2021 (hereinafter the "2021 action"). Contrary to the 2019 action where the Margitans retained counsel, Mr. Margitan signed the operative complaint in the 2021 action pro se. In the 2021 action, Mr. Margitan alleged the Hannas inflicted emotional distress on him—both intentionally and negligently—and invaded his privacy. Among Mr. Margitan's litany of grievances alleged in the 2021 complaint, he included purportedly tortious conduct by the Hannas' adult "daughter" and "son," who were not named defendants in the suit.

On April 27, 2022, with a trial date mere days away, the Hannas and Margitans agreed to a settlement after hours of negotiations. A written agreement executed that day stated that both the 2019 action and the 2021 action had "respectively settled under the following terms and conditions." CP at 1228-29.

---

[4] In the 2021 action, the superior court dismissed the Hannas' counsel, the law firm Paine Hamblen LLP, as a defendant, an order independently appealed by Mr. Margitan and not relevant here.

Under the settlement, the parties agreed that the Hannas would instruct their insurer, PEMCO, to pay $85,000.[5] Of this sum, $50,000 would be paid directly to the Margitans, while $35,000 would be placed in their counsel's trust account to be held there, until the Hannas (1) hired a contractor to dig a trench across their land for installation of a replacement water line servicing the Margitans' rental home, and (2) decommissioned their geothermal system.[6] Should the costs of excavation and replacing the heating/cooling system be less than $35,000, the remainder would be released to the Margitans. The Hannas also agreed to destroy copies of all records obtained through earlier subpoenas that Mr. Margitan had opposed.

"In exchange" for this consideration, in paragraph 5 of the settlement agreement, the Margitans agreed to "dismiss the [2019 action and 2021 action] with prejudice and without costs and . . . *execute a Release of All Claims arising out of the incidents alleged in said Complaints*." CP at 1228 (emphasis added). The parties each promised the terms of the settlement would remain confidential. The settlement agreement was signed by the Hannas, the Margitans, and their respective attorneys.

---

[5] The settlement was expressly conditioned on the acceptance of this demand by PEMCO, who agreed to it the following day.

[6] Recall that, according to the Margitans' theory, the geothermal system and its proximity to the Hannas' septic system caused the noxious odors underlying the Margitans' primary nuisance claim. The Hannas' agreement to abandon this type of heating system thus obviated the Margitans' claim of odors.

The parties presented their settlement agreement to the superior court the next day.

The court asked the attorneys to explain "the general nature of" the agreement.

Rep. of Proc. (RP) (Apr. 28, 2022) at 5. The Hannas' counsel summarized the agreement

as follows:

> [T]he concept is that funds that are paid will be utilized by Hanna to replace
> his heating system and also some funds to dig the water line that was in
> dispute. . . . [T]here'll also be some compensation . . . for the Margitans . . .
> in addition to that. Any funds that aren't expended by the Hannas to
> replace their heating system or do the excavation will also revert back to
> Mr. Margitan.
>     . . . .
>     There's also a provision to make sure that we . . . destroy or return
> the confidential records and materials that Mr. Margitan was concerned
> about. . . . Greg [the Margitans' attorney], if you want to throw something
> more in. . . . [O]f course *it results in a release of all claims* and a dismissal
> with prejudice of those two actions.

*Id.* at 6-7 (emphasis added). The Margitans' attorney immediately replied: "Judge, I

think *that accurately describes it*." *Id.* at 7 (emphasis added). The judge thanked both

sets of counsel and instructed them to "get [her] a[n] order of dismissal once you've got

all this ironed out." *Id.*

Over the next several weeks, the parties' attorneys communicated about how to

word the release of claims, exchanging numerous drafts via e-mail. A point of contention

in these negotiations was the Margitans' belief that the settlement required the Hannas to

do more than dig a trench for the installation of a new water line. The Margitans wanted

7

the Hannas to be required to excavate until they located another, *abandoned* water line, which the Margitans wanted to use as a conduit for an Internet connection. The Hannas made clear they had no opposition to the Margitans' installation of an Internet line in the easement, but they pointed to the settlement agreement itself, which contemplated the Hannas would dig a single trench adjacent to the existing water line.

In the meantime, the Hannas located contractors to perform the promised work, received a check for $85,000 from PEMCO, and stood by, ready to tender the settlement funds to the Margitans' counsel once a release was executed. Nevertheless, the failure of the Hannas to swiftly perform—notwithstanding that no release of claims had been executed—apparently enraged Mr. Margitan, whose attorney wrote to the Hannas' counsel on May 31, 2022, declaring that, "[O]ur clients [are] on the verge of *renouncing* the entire agreement." CP at 1297 (emphasis added).

Then, on June 8, 2022, without informing either the Hannas or his own attorneys, Mr. Margitan personally wrote a letter to the chief executive officer (CEO) of PEMCO, the Hannas' insurer. In his letter, Mr. Margitan announced he was "withdraw[ing] from the agreed settlement." CP at 1568. The Hannas became aware of the letter three days later and spoke to the Margitans' counsel, who were previously unaware of it.

On June 13, 2022, prompted by Mr. Margitan's stated intention to evade the settlement agreement, the Hannas' counsel e-mailed the superior court judge's

chambers—with the Margitans' counsel copied on the e-mail—stating their intention to "bring a motion to enforce [the] settlement agreement." CP at 1219. Given that the judge's retirement from the bench was less than three weeks away, the Hannas' attorney asked if the judge had "availability to hear a motion (perhaps on shortened time)." *Id.*

Without a hearing date, on June 16, the Hannas served a motion to enforce the settlement agreement on the Margitans' counsel by personal delivery and e-mail.[7] The same day, the Hannas filed and served a motion requesting that they be allowed to file the enforcement motion and related documents under seal, given the settlement agreement's confidentiality clause. The Margitans opposed the motion to seal and filed a copy of the settlement agreement themselves. Given the Margitans' apparent waiver of confidentiality, the Hannas did not press the issue, and no documents in this case were ever sealed.

On June 17, the superior court judge's judicial assistant e-mailed the Hannas' counsel—copying the Margitans' attorneys—informing them that the judge could hear a motion on shortened time on June 24. On June 21, the Hannas formally moved to shorten time, asking the court to hear their motion to enforce the settlement agreement on June 24.

---

[7] It appears the Hannas filed the motion the same day, but it was not stamped as "received" by the superior court until June 24—the day of the eventual hearing—ostensibly due to their outstanding request to file the motion under seal.

On June 22, the Margitans filed a written response, outlining their opposition to the Hannas' motion to enforce the settlement agreement. The Margitans offered several arguments against enforcement, including allegations that the agreement "fails for indefiniteness" and that the Hannas were in "material breach." CP at 1202-03. The written objection also claimed that Mr. Margitan was out of the country, in Canada, and "[i]t has been *impossible* to get his input."[8] *Id.* at 1204 (emphasis added). The Margitans also opposed the motion to shorten time, through counsel, in written filings.

The superior court held a hearing, as scheduled, on June 24. At the outset, the Hannas' counsel stated:

> The only reason we requested this motion to be heard on shortened time is because your Honor's retiring next week and will not be able to further adjudicate this case. . . .
> . . . [I]t makes sense that this matter not be heard by another judge without the knowledge of the disputes between these parties and the dynamics of the case. . . . [T]o serve judicial economy, . . . to have this pass over to another judicial officer just doesn't make sense.

RP (June 24, 2022) at 10-11. The Hannas' counsel added that there was no surprise or prejudice because the Margitans had more than one week of actual notice, "ha[d] indeed filed written responses," and provided oral argument before a commissioner of

---

[8] Contrary to their counsel's claim that it was "impossible" to get in touch with the Margitans, Mr. Margitan personally delivered a remote oral argument before our court's commissioner in another matter the very next day. *See* Wash. Ct. of Appeals Comm'r oral argument, *Margitan v. Hanna*, No. 38929-4-III (June 23, 2022), at 28 min., 45 sec. through 34 min., 48 sec. (on file with court).

our court the previous day. *Id.* at 12. The Margitans' attorney responded by asserting

that he had spoken to Mr. Margitan "yesterday afternoon, and . . . the call kept dropping."

*Id.* at 14.

The superior court judge granted the motion to shorten time, explaining that it was

her last day on the bench and reasoning that she was uniquely well-situated to rule on the

motion to enforce the settlement because she had spent years familiarizing herself with

the "complex chain of events" that preceded it. *Id.* at 19. The judge acknowledged

"there's difficulty reaching Mr. Margitan" but pointed out that he had remotely

participated in a hearing before the court the previous day. *Id.* at 19-20. Therefore, the

judge concluded that the difficulties in communication clearly "could . . . have been

overcome." *Id.* at 20.

Turning to the motion to enforce the settlement agreement, the Hannas' attorney

commended opposing counsel for "admirabl[y]" trying to represent a "rogue client[ ]."

*Id.* at 33. But the Hannas explained they were ready to perform under the settlement

agreement as written and were simply waiting for the Margitans to agree to a release of

all claims as promised.

The Margitans' counsel then complained, "We're being asked to agree to a lot of

things that aren't part of this negotiated settlement agreement . . . ." *Id.* at 28. The court

immediately retorted, "Like what?" *Id.* Counsel responded that the Hannas had drafted

recitals for the release of claims that the Margitans saw as inaccurate and one-sided.  The

judge pointed out that the offending recitals had been excised from the latest drafts, and

the Margitans' attorney agreed.

The court then asked about Mr. Margitan's attempt to require the Hannas to locate

his abandoned water line, inconsistent with the parties' settlement.  Counsel for the

Margitans responded, "No, . . . we've never pushed that. . . .  [W]e made a suggestion

. . . .  And [the Hannas] said, 'No, we have no responsibility to . . . locate the water line.'

And . . . I looked, *and they're right; I can't force them to locate it*."  *Id.* at 29 (emphasis

added).

The court then asked the Margitans' counsel point-blank: "What material terms

are missing?"  *Id.* at 30.  Counsel responded that the Hannas' time for performance was

not contemplated in the written agreement.  The court continued: "Is that something that

was bargained for?"  *Id.* at 31.  The Margitans' attorney responded: "*No, it really

wasn't*."  *Id.* (emphasis added).  Counsel went on to concede that "[t]ypically when time

isn't stated [in a contract], the time for performance is a reasonable time."  *Id.*

Nevertheless, counsel explained that "Mr. Margitan is very upset" because "we can't

force Mr. Hanna to do it right away . . . ."  *Id.* at 31-32.  The Hannas' counsel responded

that, contrary to the Margitans' implication, "[B]oth sides want it done now."  *Id.* at 33.

12

The court began its oral ruling by noting the parties' settlement agreement was "signed by all the parties." *Id.* at 35. The court went on:

> I don't know what Mr. Margitan's motivations are here, but I don't know that it takes a rocket scientist to read between the lines. . . . [Mr. Margitan is] a smart man. He entered into a bargain. He agreed and he signed on the dotted line that this was going to resolve the case. He has not moved forward with that agreement. He claims that the Hannas stalled the agreement, when actually it was the Margitans who stalled the agreement by making demands and adding conditions that were not part of the agreement.
>      Time frame is not part of this agreement; at least it's not handwritten into the agreement. But it appears to me that really no one wasted any time here. . . . [I]t's ready to go at this point; the check [from PEMCO] has been ready for weeks now. And so I am going to grant the motion enforcing the settlement agreement, [and] order the Margitans to sign off on the [release].

*Id.* at 36-37.

After granting the motion to enforce the settlement agreement, the court ordered the Margitans to sign release language. Under the court-ordered release, the Margitans released all claims arising from incidents alleged in the 2019 and 2021 actions, with specific language explaining that the Margitans would not be precluded from suing the Hannas for nuisance again if new odors arose.

The Margitans' counsel ended the hearing by asking a clarifying question about whether the Margitans' claims against "nonparties" would be released. *Id.* at 46. Counsel conceded, "obviously PEMCO gets released," but asked whether claims against the Hannas' adult children were also released. *Id.* The court directed the Margitans'

13

attorney to the language of the release: the Margitans would be required to release claims "arising out of . . . acts and omissions by Hannas and certain Hanna family members, *as reflected in* [the 2019 action and the 2021 action]." CP at 1348 Counsel for the Margitans responded, "*I agree*, thank you." RP (June 24, 2022) at 52 (emphasis added).

The Margitans moved for reconsideration of the orders shortening time and enforcing the settlement agreement. Due to the superior court judge's retirement, the motion was reassigned to one of her bench mates. The second judge "declin[ed] to consider" the motion, reasoning that if he were to "reconsider an order previously entered by" another trial court judge, he would "effectively be acting in an appellate capacity." CP at 1532. He reasoned that the superior court "lacks such authority." *Id.*

The Margitans appealed, seeking review of 14 trial court orders in this matter. On the Hannas' motion, a commissioner of our court entered an order limiting the scope of appeal to the order enforcing the settlement agreement, reasoning that if we affirmed the enforcement of the settlement, the other issues would be rendered moot. *See* Comm'r's Ruling, *Hanna v. Margitan*, No. 39077-2-III, at 6-7 (Wash. Ct. App. Oct. 21, 2022). Both the Margitans and the Hannas moved to supplement the record. Both motions were denied. *See* Comm'r's Ruling, *Hanna v. Margitan*, No. 39077-2-III, at 4-7 (Wash. Ct. App. Aug. 18, 2023); Notation Ruling from Tristen Worthen, Clerk of Court, *Hanna v. Margitan*, No. 39077-2-III (Wash. Ct. App. Oct. 30, 2023).

14

ANALYSIS

The Margitans contend the trial court erred by (1) granting the Hannas' motion to enforce the parties' settlement agreement and (2) hearing the motion on shortened time. We reject the Margitans' contentions and affirm.

As an initial matter, the Margitans cavalierly ask us to take judicial notice of the trial records in prior cases we have decided involving the Hannas and the Margitans. We reject the Margitans' invitation to peruse the records in our prior cases because those cases are "'independent and separate judicial proceedings'" involving the same parties, rather than proceedings ancillary to this one. *See Spokane Rsch. & Def. Fund v. City of Spokane*, 155 Wn.2d 89, 98, 117 P.3d 1117 (2005) (quoting *In re Adoption of B.T.*, 150 Wn.2d 409, 415, 78 P.3d 634 (2003)).

### DID THE TRIAL COURT ERR IN GRANTING THE MOTION TO ENFORCE THE SETTLEMENT AGREEMENT?

A trial court's ruling on a motion to enforce a settlement agreement is reviewed de novo. *See Lavigne v. Green*, 106 Wn. App. 12, 16, 23 P.3d 515 (2001). As the moving party, the Hannas carried the burden of proving there was "no genuine dispute" about "the existence and material terms" of the parties' agreement. *Brinkerhoff v. Campbell*, 99 Wn. App. 692, 696-97, 994 P.2d 911 (2000). To satisfy this burden, the Hannas needed to show that the parties contemporaneously agreed "to the same bargain."

15

*Pac. Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 555-56, 608 P.2d 266 (1980).  We consider the record in "the light most favorable to" the Margitans and "determine whether reasonable minds could reach but one conclusion."  *Brinkerhoff*, 99 Wn. App. at 697.

Because settlement agreements are governed by the common law of contracts, mutual assent is required.  *See Condon v. Condon*, 177 Wn.2d 150, 162, 298 P.3d 86 (2013); *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d 38, 48, 470 P.3d 486 (2020).  We give the words in a contract their ordinary, reasonable meaning.  *Cronin v. Cent. Valley Sch. Dist.*, 23 Wn. App. 2d 714, 755-56, 520 P.3d 999 (2022).  The "subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used."  *Brogan & Anensen, LLC v. Lamphiear*, 165 Wn.2d 773, 776, 202 P.3d 960 (2009).

Here, the plain text of the settlement agreement reveals that an enforceable agreement existed, Mr. Margitan's later attempt to rescind it notwithstanding.  The Margitans attempt to concoct a factual dispute by claiming there are elements of the court-ordered release that they did not agree to.  They point to four supposed discrepancies between the settlement and the release.

First, the Margitans complain that they never agreed to "forever" resolve all claims arising out of the Hannas' "acts" alleged in their 2019 and 2021 complaints.

CP at 1348-49.  But in reality, the Margitans agreed to do precisely that.  They signed the settlement agreement, by which they agreed to "execute a Release of *All* Claims arising out of the incidents alleged in said Complaints."  *Id.* at 1228 (emphasis added).

It is also not entirely clear to us what the Margitans intend by this argument. If their worry is that the release "forever" forbids them from suing the Hannas for *any* "acts," then they can rest assured: that worry is ridiculous.  *Id.* at 1348-49.  The settlement and the release simply require them to "forever" release claims stemming from all "acts" alleged in the prior suits.  *Id.*  No reasonable reader of the release could conclude it forbids the Margitans from ever suing the Hannas if the Hannas commit tortious conduct in the future.

Conversely, it is possible the Margitans are claiming they merely bound themselves to dismiss the lawsuits, not to release related claims.  Such an interpretation would mean that, after dismissing their suits, the Margitans could simply refile identical complaints.  If that is indeed the Margitans' contention, not only does their strained interpretation flout the plain language of paragraph 5 of the settlement, it would impermissibly "render [their] contract obligations illusory."  *Taylor v. Shigaki*, 84 Wn. App. 723, 730, 930 P.2d 340 (1997).  The Hannas would not have agreed to settle with the Margitans without assurance that the instant controversy was behind them.

17

Second, the Margitans contend they never agreed to release claims against the Hannas' adult children and insurer.[9] As to the Hannas' insurer, this complaint is waived because the Margitans' counsel affirmatively agreed the insurer should be released. *See* RP (Jun. 24, 2022) at 46 ("[O]bviously PEMCO gets released . . . ."). And as to the Hannas' adult children, again, the plain text of the settlement agreement easily dispels the Margitans' argument. The Margitans agreed to "execute a Release of *All* Claims arising out of *the incidents* alleged in said Complaints." CP at 1228 (emphasis added). And several of the "incidents alleged in" the Margitans' 2021 complaint alleged tortious conduct on the part of the Hannas' "son" and "daughter." By signing the settlement agreement, the Margitans agreed to release any claims against the Hannas' children, because they agreed to "[r]elease . . . [a]ll" claims arising out of "incidents alleged in" the 2021 complaint. *Id.*

---

[9] The Margitans also contend the court lacked "jurisdiction" to require they release claims against the Hannas' adult children and insurer. The Margitans misunderstand the concept of jurisdiction, which is simply a court's authority to decide cases involving certain persons and certain subject matter. *See J.A. v. State*, 120 Wn. App. 654, 657, 86 P.3d 202 (2004); *Amy v. Kmart of Wash., LLC*, 153 Wn. App. 846, 852, 223 P.3d 1247 (2009); *Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 649, 336 P.3d 1112 (2014). The trial court may not have had jurisdiction over the Hannas' adult children or insurer, who were nonparties. But that is of no import because the trial court did not require those nonparties to do anything; rather, it required the Margitans to release their claims against those nonparties. And there is no serious dispute here that the superior court had jurisdiction over the Margitans.

Third, the Margitans contend the settlement agreement was missing a material element because it did not contemplate a specific time by which the Hannas were required to perform. This argument fails because "[w]here a contract is silent as to duration or states time for performance in general and indefinite terms," a "reasonable time" is implied. *Pepper & Tanner, Inc. v. KEDO, Inc.*, 13 Wn. App. 433, 435, 535 P.2d 857 (1975); *see also Smith v. Smith*, 4 Wn. App. 608, 612, 484 P.2d 409 (1971). And here, the trial court asked the Margitans' counsel, "Is [timing of performance] something that was bargained for?" and counsel conceded: "No, it really wasn't. . . . Typically when time isn't stated, the time for performance is a *reasonable time*." RP (June 24, 2022) at 31 (emphasis added). Nevertheless, the Margitans' counsel explained his client was "very upset" because, under the settlement, "we can't force Mr. Hanna to do it right away." *Id*. at 31-32. Needless to say, the mere fact that Mr. Margitan was unhappy, after the fact, with the agreement he signed is not a basis for evading enforcement of the agreement.[10]

---

[10] The Margitans also contend the settlement was substantively unconscionable because it failed to definitely state the time for performance. A contract is substantively unconscionable only where it is so one-sided that it can be described as "'monstrously harsh'" or "'exceedingly calloused.'" *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 344-45, 103 P.3d 773 (2004) (quoting *Nelson v. McGoldrick*, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995)). Contracts that fail to specify a time for performance are commonplace and unremarkable, not atypically one-sided, let alone monstrous.

Fourth, the Margitans insist there was a dispute as to how much the Hannas were required to excavate under the agreement. But the only supposed dispute here was created by Mr. Margitan *after* he signed the agreement. Under the settlement agreement, the parties agreed the Hannas would hire a contractor to dig a trench across their property into which the Margitans could place a new waterline. Only after signing that agreement did Mr. Margitan seek to newly require the Hannas to keep digging until they found the Margitans' old, abandoned waterline. But that was not the deal the parties agreed to. Mr. Margitan's "remorse or second thoughts" about the agreement he signed did not and cannot create a genuine dispute of material fact. *Lavigne*, 106 Wn. App. at 19.

The Margitans fault the court for failing to hold an evidentiary hearing before enforcing the settlement agreement. But such a hearing is only required if there is a "genuine issue of material fact." *Brinkerhoff*, 99 Wn. App. at 697. To defeat enforcement of a settlement agreement, "the 'purport' of the agreement must be disputed," not just minutiae. *Lavigne*, 106 Wn. App. at 19 (quoting CR 2A). And as explained above, there was no genuine dispute as to any of the settlement's material terms.

Contrary to the Margitans' insistence on appeal, nor was the settlement agreement a mere "agreement to agree." *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 175, 94 P.3d 945 (2004) (explaining such agreements are unenforceable because

they require a further meeting of the minds). No further meeting of the minds as to material terms was required. *See Loewi v. Long*, 76 Wash. 480, 484, 136 P. 673 (1913) (holding a contract is enforceable where "the subject-matter is not in dispute, the terms are agreed upon, and the intention of the parties plain," even if the parties contemplated a subsequent writing).

Under the settlement, the Hannas would pay money (through their insurer), dig a trench, decommission their geothermal system, and destroy records, in exchange for a release of all claims. Those material terms are sufficiently definite, notwithstanding that the parties still needed to actually draft the comprehensive release, and notwithstanding the lawyerly wrangling about the release's precise language in the following weeks. *See Morris v. Maks*, 69 Wn. App. 865, 872, 850 P.2d 1357 (1993) (holding that informal letters exchanged by the parties' attorneys created a binding settlement agreement, notwithstanding that the parties also intended to subsequently draft a formal contract).

The Margitans' next argument is that they were induced to sign the settlement by misstatements made by the Hannas' counsel amounting to fraud. *See Wash. Fed. Sav. & Loan Ass'n v. Alsager*, 165 Wn. App. 10, 18, 266 P.3d 905 (2011) (noting a contract may be rendered void if one party induced the other to enter into the contract through a "misrepresentation" on which the other party "*justifiably relied*" (boldface omitted)).

Specifically, the Margitans fault the Hannas' counsel for telling them that the fastest way to construct a new waterline through the Hannas' lot would be to settle. We disagree.

Assuming the Hannas' counsel made the purported comment, it would not constitute fraud. Among other elements, a claim of fraud requires a misrepresentation of existing fact. *Adams v. King County*, 164 Wn.2d 640, 662, 192 P.3d 891 (2008). "[A] false promise does not constitute the representation of an existing fact." *Id.*

Finally, the Margitans contend the superior court erred by failing to require that the settlement agreement be read into the record in open court, citing CR 2A and RCW 2.44.010. But the Margitans misread both the rule and the statute they cite. CR 2A only requires an "agreement . . . between parties" to be "made and assented to in open court on the record" if "the evidence" of the agreement is not "in writing." Here, the settlement agreement *was* reduced to a writing. And RCW 2.44.010 merely addresses the "authority" of "[a]n attorney . . . [t]o bind his or her client." *See also In re Marriage of Langham*, 153 Wn.2d 553, 561, 106 P.3d 212 (2005); *Smyth Worldwide Movers, Inc. v. Whitney*, 6 Wn. App. 176, 491 P.2d 1356 (1971). The statute has no applicability to this case, where the Margitans *personally* bound themselves to the settlement agreement by signing it.

No. 39077-2-III
*Hanna v. Margitan*

DID THE TRIAL COURT ERR IN HEARING THE HANNAS' MOTION ON SHORTENED TIME?

A civil litigant may seek to have a motion heard on less than the usually required notice by filing a motion to shorten time. *See* 3A ELIZABETH A. TURNER, WASHINGTON PRACTICE: RULES PRACTICE, at 185 (7th ed. 2021) (citing CR 6(d)). Here, the Margitans contend the trial court erred by hearing the Hannas' motion on shortened time. This contention fails.

"A trial court has discretion when ruling on a motion to shorten time." *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 236, 88 P.3d 375 (2004). We review such discretionary decisions for abuse of discretion. *See id.* A trial court abuses its discretion when its ruling is based on untenable grounds or reasons or is otherwise manifestly unreasonable. *See, e.g.*, *Graser v. Olsen*, 28 Wn. App. 2d 933, 940, 542 P.3d 1013 (2023). Furthermore, "[t]o prevail on an appeal challenging a trial court's deviation from normal time limits, the appellant must demonstrate it was prejudiced by the trial court's actions." *Zurich Servs. Corp. v. Gene Mace Constr., LLC*, 26 Wn. App. 2d 10, 28, 526 P.3d 46 (2023). To establish prejudice, the Margitans must show (1) a lack of actual notice, (2) a lack of time to prepare for the motion, and (3) no opportunity to submit case authority or provide countervailing oral argument. *Id.*

23

The Margitans' challenge to the order shortening time fails for two independent reasons. First, the trial court acted well within its discretion, and, second, the Margitans cannot establish prejudice.

The Hannas' reason for moving to shorten time was that the superior court judge who had overseen the litigation for more than two years was rapidly nearing her scheduled retirement from the bench. If the motion was calendared after her retirement, a different judge would have been tasked with quickly familiarizing themself with the convoluted, years-long history of the case, requiring herculean effort. Given her unique familiarity with the dynamics of the case, no other superior court judge was as well situated to decide the Hannas' motion. She properly invoked this reasoning in granting the motion to shorten time. On its face, this was a tenable reason for hearing the motion on shortened time. *See generally State v. Castillo-Lopez*, 192 Wn. App. 741, 748, 370 P.3d 589 (2016) ("Trial courts have discretion to manage their docket . . . .").

The only argument the Margitans can muster against the trial court's rationale is that "not a single case can be found where a judge leaving the bench was an appropriate basis to shorten time." Appellants Margitans' Reply Br. at 25. As an initial matter, the Margitans' claim is not totally accurate. We have found at least one decision, albeit unpublished, where we mentioned in passing that "an order shortening time . . . was *required* because of [the trial judge's] pending retirement." *In re Estate of Davila*, noted

24

at 167 Wn. App. 1003, 2012 WL 927102, at *2 (emphasis added). Although nonprecedential, *see* GR 14.1(a), *Davila*'s casual reference to an order shortening time for this precise reason suggests we were unperturbed.

More importantly, the Margitans' argument is logically flawed because they ask us to infer a legal rule merely from the case law's silence as to this precise situation. Just because no published decision has ever *approved* a judge's impending retirement as a reason to shorten time does not mean that such reasoning is *disapproved*. *See generally Karahalios v. Def. Language Inst.*, 821 F.2d 1389, 1392 (9th Cir. 1987) (noting that arguments from silence are "normally weak"); *State v. Running Wolf*, 2020 MT 24, 398 Mont. 403, 416, 457 P.3d 218 (noting that not every silence is meaningful).

Finally, even if the trial court abused its discretion, the Margitans cannot show they were prejudiced by the order shortening time. First, the Margitans and their counsel received actual notice of the motion. *See Zurich Servs.*, 26 Wn. App. 2d at 28. Second, the Margitans had plenty of time to prepare for the motion. *See id.* In their briefs, the Margitans claim their attorneys had only two days to prepare a response to the Hannas' motions. While it is true that the motions to enforce the settlement agreement and to shorten time were not formally received by the superior court until shortly before the hearing, this omits important context. The Hannas' motion was precipitated by Mr. Margitan's own letter, sent to PEMCO's CEO, in which he openly stated an intent

to renege on the settlement. With that backdrop, the Margitans cannot seriously claim to have been surprised at the last minute by the Hannas' motion.

And prompted by Mr. Margitan's letter, the Hannas e-mailed the superior court judge's chambers—copying the Margitans' counsel—a full 11 days before the eventual hearing, stating they would be moving to enforce the agreement. Nor do the Margitans dispute that the Hannas personally served their counsel with the motion eight days before the hearing. Finally, the Margitans' attorneys had an "opportunity to submit case authority" and "provide countervailing oral argument," and in fact did so. *Zurich Servs.*, 26 Wn. App. 2d at 28. There was no prejudice here.[11]

---

[11] The Margitans contend they were prejudiced because they were out of the country, in Canada, and unable to attend the June 24, 2022 hearing or communicate with their counsel about the Hannas' motion. The Margitans do not say when they left for Canada, so it is unclear whether they were out of the country for the entire 11-day period between the Hannas' e-mail stating their intent to move to enforce the settlement and the hearing on that motion. And again, the Hannas' motion to enforce the settlement was precipitated by Mr. Margitan's own repudiation of the contract. Plus, in a separate case—where he was proceeding pro se—Mr. Margitan remotely delivered oral argument before our court's commissioner the day before the superior court hearing. *See* Wash. Ct. of Appeals Comm'r oral argument, *Margitan v. Hanna*, No. 38929-4-III (June 23, 2022), at 28 min., 45 sec. through 34 min., 48 sec. (on file with court). Even if communicating with his counsel from Canada would have been difficult, it was clearly not impossible.

No. 39077-2-III
*Hanna v. Margitan*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_Lawrence-Berrey, C.J._
Lawrence-Berrey, C.J.

WE CONCUR:

_Fearing, J._                          _Staab, J._
Fearing, J.                             Staab, J.